UNITED CONTROL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77477. Filed September 27, 1962.

*Merle D. Cohn, Esq.*, for the petitioner.
*Norman H. McNeil, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in income tax against petitioner as follows:

| Fiscal year ended Aug. 31— | Amount |
| --- | --- |
| 1954 | $50, 854. 36 |
| 1955 | 50, 415. 03 |
| 1956 | 25, 107. 43 |

Some of the issues have been stipulated. The only issue remaining for our consideration is whether petitioner may deduct the excess of authorized salaries over the amount it actually paid to its four officers during each of the fiscal years in issue.

### FINDINGS OF FACT.

Most of the facts have been stipulated and are incorporated herein by this reference.

The United Control Corporation, hereinafter referred to as petitioner, was incorporated under the laws of the State of Washington on September 25, 1948. Its principal office and manufacturing facilities have been located in Seattle, Washington, until March 1961 when it moved to a new plant facility in Redmond, Washington. Petitioner is engaged primarily in the design, manufacture, and sale of electronic control systems, electronic equipment, and accessory devices for military and commercial aircraft, missiles, and industrial uses.

During all times material herein, the outstanding and issued shares of stock of the petitioner were held as follows:

|  | Shares | Percent |
| --- | --- | --- |
| Louis P. Hanson | 180 | 34 |
| Howard H. Suskin | 180 | 34 |
| Martin K. Lilleberg | 88 | 16 |
| Jake Graybeal | 88 | 16 |
| Total | 536 | 100 |

During all times in issue herein, the above four stockholders were directors and the principal executive officers of petitioner. All four

men were unrelated to one another and none were engaged in any partnership with any of the others.

Beginning with the fiscal year ended August 31, 1951, petitioner and the Pacific National Bank of Seattle (hereinafter referred to as the bank) began entering into yearly recurring credit agreements whereby petitioner was enabled to borrow substantial amounts of cash for its business from the bank. Such credit agreements, substantially similar in their provisions, were in effect continually until December 31, 1960.

The credit agreements in effect during the fiscal years ended August 31, 1951, 1952, and 1953, as did the subsequent agreements provided, *inter alia*, for the limits which petitioner could pay out each year as officers' salaries.

As of August 31, 1953, petitioner's books reflected accrued liabilities to its four officers in the amount of $117,735.38, which amount represented the total amount of authorized officers' salaries for the previous 3 fiscal years which remained unpaid because of the cash outlay restrictions in the credit agreements then in force.

The minutes of the annual meeting of petitioner's board of directors held on August 20, 1953, state, in part, as follows:

A discussion of salaries for the officers and department superintendents of the corporation was had, and it was moved, seconded and passed that for the year commencing September 1, 1953, and ending August 31, 1954, salaries will be the following sums:

 President and general manager, $27,500.00
 Treasurer and business manager $25,000.00
 Superintendent, engineering $22,000.00
 Superintendent, material $22,000.00.

and that said salaries are hereby declared approved and authorized, and that payment of the same should be made by this company as soon as approval for the payment of the same can be had from the Pacific National Bank, pursuant to the credit agreement in force by and between the said Pacific National Bank and this corporation; it was noted that said credit agreement referred to restricts the payment of salaries to the officers of this company to the sum of $10,000.00 per year. It was moved, seconded and passed that overtime work by the officers and superintendents should be accounted for as in the past, and accrued on the books at one and one-half the straight time rate based on this $10,000.00 limitation per year. At the end of the fiscal year authority to pay the aforementioned salaries in full should be requested from the Pacific National Bank. If this authority be denied by said Pacific National Bank, as it has been denied for the past fiscal year, then authority will be requested to pay the overtime accrual in addition to the $10,000.00 annual withdrawals now permitted; it being the intent that any payment so authorized will be applied against the annual salaries set forth above. It was noted that the company is in a good financial condition to presently pay the aforementioned annual salaries, but is restricted from so doing by the aforementioned credit agreement.

Pursuant to such meeting, petitioner on October 30, 1953, wrote two letters to the bank requesting authority to pay the accrued salaries of $117,735.38 as of August 31, 1953.

A letter from the bank to petitioner dated November 3, 1953, stated, in part, as follows:

THE PACIFIC NATIONAL BANK OF SEATTLE

*Second Avenue and Marion Street*

*Seattle 11, Washington, November 3, 1953.*

Mr. HOWARD H. SUSKIN, *Treasurer*
UNITED CONTROL CORPORATION
*3214 E. 47th Street*
*Seattle 5, Washington*

DEAR MR. SUSKIN:

   *      *      *      *      *      *      *

Under the terms of the loan agreement, the salaries for the four officers in question, namely: Louis P. Hanson, Howard H. Suskin, Martin K. Lilleberg and Jake Graybeal, are limited to $10,000 each, or a total of $40,000.

First of all, we would be the first to admit that a salary of $10,000 presently allowed to each of the above officers is very nominal, considering the perplexity of the work, the amount of the time involved and the volume of work being done by the company, which is a direct result of the initiative and intelligence of the four individuals involved. We do not question that the salaries, as authorized by the Board of Directors, would be fair compensation and more in line with what could be obtained by these individuals were they to apply their talents in the employ of some other corporation.

In view of these requests, we have reviewed the year and figures of United Control Corporation as of August 31, 1953, and in our opinion, if the total amount involved in your letters, which would namely be $117,735.38, were to be paid in cash, it would place a severe burden on the working capital of your company, particularly when the size of your backlog of orders is considered.

An analysis of the net profit shows that after all expenses, including the authorized salaries, the company was able to achieve approximately 2% on their sales. The United Control Corporation is a prime example of the difficulties encountered by a small corporation, under the present tax laws, in building up a sufficient net worth out of profits to adequately provide facilities, equip the plant with machinery, and have sufficient working capital to take care of expanding volume of business. To accomplish this goal, it will be necessary for the four officers to forego the payment of these salaries, at perhaps a personal sacrifice, and therefore your request for the payment of these funds is denied.

Preliminary discussions have already been held with you regarding the amount of bank credit which will be required by United Control Corporation for the coming year, and you have informed us that our present limit of $150,000 will have to be raised to $200,000 in order to adequately finance the company's contracts. In order to obtain this amount of credit from this bank with a capital of $53,800 and a surplus of $74,466, we will insist on the entire amount of $117,735.38 being subordinated to our loans.

On January 22, 1954, petitioner and the bank entered into another credit agreement which was substantially similar to the previous agreements (except for the amount of the subordinated debts to the officers) which became effective as of August 31, 1953. This agreement provided, in part, as follows:

*Section C.   Subordination of Indebtedness to Officers.*

Contemporaneously herewith the payment of certain indebtedness of Borrower to certain of its officers, the total principal amount of which was $117,735.38

as of the effective date hereof, has been subordinated to all indebtedness of Borrower incurred under this agreement. Each such indebtedness is evidenced by an account payable in appropriate form on Borrower's books in principal amounts as follows:

| Name | Amounts |
|---|---|
| Louis P. Hanson, President | $28, 733. 95 |
| Martin Lilleberg, Vice President | 27, 273. 04 |
| Jake Graybeal, Secretary | 29, 402. 02 |
| Howard H. Suskin, Treasurer | 32, 326. 37 |
| Total | $117, 735. 38 |

\*       \*   .       \*       \*       \*       \*       \*

*Section A. Payments to Officers and Shareholders.*

Bank approves and consents to the payment of an annual salary of $10,000 to each of the following officers of Borrower:

Louis P. Hanson, President
Martin Lilleberg, Vice President
Jake Graybeal, Secretary
Howard Suskin, Treasurer

No other compensation, salaries or cash withdrawals shall be paid to or made by any of the officers or shareholders of Borrower, and no dividends or bonuses shall be declared or paid by Borrower without the prior written consent of Bank.

\*       \*       \*       \*       \*       \*       \*

*Section C. Indebtedness to Others.* Borrower shall not borrow from or otherwise incur any indebtedness, outside of or in addition to the advances for which provision is made herein, to any person, firm or corporation, or to the government of the United States of America or any agency thereof, without the prior written consent of Bank, except that nothing contained in this Section C shall be construed as preventing Borrower from creating trade accounts common and usual in the business of Borrower.

\*       \*       \*       \*       \*       \*       \*

*Section O. Waivers.* No waiver of any of the terms, conditions or provisions of this agreement shall be deemed to have been given by Bank unless the same be in writing and signed by a duly authorized officer of Bank. No such waiver, whether express or implied, of any breach by Borrower of any of the terms, conditions or provisions of this agreement, or of any note, assignment or other related document, shall be construed to be a waiver of any subsequent breach of Borrower of such term, condition or provision, or of any other term, condition or provision of this agreement, or any note, assignment or other related document.

Pursuant to the above credit agreement, while officers' salaries were authorized in the amount of $96,500 for the fiscal year ended August 31, 1954, only $40,000 was actually paid to them and the balance, $56,500, was accrued on the books as a liability to the officers, resulting in a total balance as of that date of $174,235.38.

The minutes of the annual board meeting of petitioner held on September 3, 1954, repeat the same discussion and resolutions concerning officers' salaries as the previous meeting with the same total officers' salaries authorized for the fiscal year ended August 31, 1955, in the amount of $96,500.

Again, pursuant to such meeting, petitioner wrote to the bank requesting authority to pay all or a portion of the accrued salaries as of August 31, 1954, in the amount of $174,235.38.

Once again, in a letter dated November 1, 1954, the bank refused authority to pay out any amounts in excess of that authorized by the credit agreement because "it would be most necessary to retain every possible dollar of working capital."

Petitioner and the bank entered into another credit agreement as of December 31, 1954, substantially similar to previous agreements, limiting the total payment of officers' salaries to $40,000. The agreement also provided, as follows:

*Section C. Subordination of Indebtedness to Officers.*

Contemporaneously herewith the payment of certain indebtedness of Borrower to certain of its officers, the total principal amount of which was $174,235.38 as of the effective date hereof, has been subordinated to all indebtedness of Borrower incurred under this agreement. Each such indebtedness is evidenced by an account payable in appropriate form on Borrower's books in principal amounts as follows:

| *Name* | *Amounts* |
| --- | --- |
| Louis P. Hanson, President | $46,233.95 |
| Martin Lilleberg, Vice President | 39,273.04 |
| Jake Graybeal, Secretary | 41,402.02 |
| Howard H. Suskin, Treasurer | 47,326.37 |
| Total | $174,235.38 |

During the fiscal year ended August 31, 1955, petitioner paid officers' salaries totaling $40,000 accruing the excess of the authorized salaries over this amount, $56,500, on its books as a liability to its officers. The balance of this liability as of August 31, 1955, was $230,735.38.

The minutes of the annual board meeting held on September 2, 1955, repeat the same discussion and resolutions concerning officers' salaries as the previous two meetings, with the same total salaries authorized for the fiscal year ended August 31, 1956, of $96,500.

Pursuant to this meeting, petitioner again wrote to the bank requesting authority to pay all or a portion of the accrued salaries owing to the officers as of August 31, 1955, in the amount of $230,735.38.

Once again the bank denied the request because of increased loans made by it during the previous year and petitioner's inability to pay its current bills.

Petitioner and the bank entered into another credit agreement, substantially similar to the previous agreements, effective as of December 1, 1955. This agreement, however, raised the limitations on the payments of officers' salaries as follows:

| | |
|---|---|
| Hanson | $14,000 |
| Suskin | 14,000 |
| Lilleberg | 12,000 |
| Graybeal | 12,000 |
| Total | $52,000 |

The agreement also provided, *inter alia*, for the following:

### Section C. Subordination of Indebtedness to Officers.

Contemporaneously herewith the payment of certain indebtedness of Borrower to certain of its officers, the total principal amount of which was $244,860.38 as of the effective date hereof, has been subordinated to all indebtedness of Borrower incurred under this agreement. Each such indebtedness is evidenced by an account payable in appropriate form on Borrower's books in principal amounts as follows:

| Name | Amounts |
|---|---|
| Louis P. Hanson, President | $68,108.95 |
| Martin Lilleberg, Vice President | 54,273.04 |
| Jake Graybeal, Secretary | 56,402.02 |
| Howard H. Suskin, Treasurer | 66,076.37 |
| Total | $244,860.38 |

During the fiscal year ended August 31, 1956, petitioner paid the following salaries to its four officers:

| | |
|---|---|
| Hanson | $13,000 |
| Suskin | 13,000 |
| Lilleberg | 11,500 |
| Graybeal | 11,500 |
| Total | $49,000 |

The excess of the total amount authorized of $96,500 over the amount paid of $49,000, or $47,500, was again accrued on petitioner's books as a liability to its officers, such liability totaling $278,235.38 as of August 31, 1956.

On September 25, 1956, petitioner wrote to the bank requesting that authority be granted to make payment of such amount of the unpaid salaries as the bank considered advisable.

In response to this request, the bank wrote, in part, as follows:

Our first reaction is to modify in part our requirements that these monies be left in the company because of the excellent progress you are making. We also know that you could command more money from other employers in the form of actual take-home pay than is being granted to you under the terms of our loan arrangement. However, once again it is our duty to refuse your request for the reason that you are borrowing what might be termed exorbitant amounts of money in connection with your program when compared to your invested capital. This is best borne out by the fact that we have found it necessary, due to your increased needs, to substantially increase the amounts of money made available to you for the orderly conduct of your business. Your backlog on August 31 you inform us is slightly in excess of $4,000,000 and shows every sign

of increasing as the months go by and as the various new airplanes are brought to a productive stage.

It is with regret therefore that permission is refused to pay any part of the accumulated salaries which are subordinated to the bank's loan. I think it is only fair to say that as long as the company continues to expand its program, and therefore the needs for borrowed money will ever be on the increase, we will probably be forced to refuse such requests until such time as additional equity capital can be injected into the company.

Sincerely yours,

(S) PAUL W. KITTO
*Vice President*

The total salaries authorized by the board of directors, the amount actually paid, and the accrued salaries as of the end of each of the fiscal years ending August 31, 1951, through August 31, 1956, are as follows:

*Schedule A*

| Year ended Aug. 31— | Salary authorized and deducted on return | Salary paid | Salary accrued | Cumulative unpaid salaries at close of year |
|---|---|---|---|---|
| 1951 | $51,048.15 | $37,460 | $13,588.15 | $13,588.15 |
| 1952 | 87,647.23 | 40,000 | 47,647.23 | 61,235.38 |
| 1953 | 96,500.00 | 40,000 | 56,500.00 | 117,735.38 |
| 1954 | 96,500.00 | 40,000 | 56,500.00 | 174,235.38 |
| 1955 | 96,500.00 | 40,000 | 56,500.00 | 230,735.38 |
| 1956 | 96,500.00 | 49,000 | 47,500.00 | 278,235.38 |

On September 30, 1957, petitioner gave to each of its four officers a written acknowledgment of its indebtedness for all unpaid salaries due them as of that date which stated that "it intends and does hereby promise again to pay said indebtedness."

During the fiscal years ended August 31, 1950, through August 31, 1956, petitioner's net income, assets, liabilities, and earned surplus were as follows:

*Schedule B*

| Fiscal year ending Aug. 31— | Net income | Assets | Liabilities | Earned surplus |
|---|---|---|---|---|
| 1950 | $1,933.31 | $44,727.78 | $22,013.61 | $1,514.17 |
| 1951 | 23,158.67 | 205,657.22 | 146,701.03 | 14,956.19 |
| 1952 | 130,833.91 | 364,683,67 | 252,949.09 | 58,134.58 |
| 1953 | 70,181.60 | 527,424.55 | 428,958.07 | 44,866.48 |
| 1954 | 56,811.31 | 621,058.00 | 472,683.43 | 94,775.17 |
| 1955 | 122,840.93 | 1,132,253.57 | 938,786.78 | 139,866.79 |
| 1956 | 198,262.71 | 1,398.097.02 | 1,119,297.74 | 225,199.28 |

The above liabilities include the accrued and unpaid salaries and the following indebtedness to the bank to which these unpaid salaries were subordinated.

| Fiscal year ended Aug. 31— | Amount |
|---|---|
| 1954 | $200,000.00 |
| 1955 | 384,784.48 |
| 1956 | 391,530.87 |

Petitioner's earned surplus as of August 31, 1960, was $1,408,528.

Petitioner's four officers had knowledge of all of the provisions in the credit agreements.

During the entire period of time covered by the credit agreements, the bank was aware of the fact that the authorized officers' salaries were in excess of the amounts allowed to be paid each year as salaries under the credit agreements then in effect and had no objections to such practice.

On November 29, 1958, the petitioner's authorized capital stock was increased from 1,500 shares of common voting stock, having a par value of $100 per share, to 1,500,000 shares of common voting stock, having a par value of $1 a share, and 450,000 shares of the new stock were thereafter issued to the four stockholders of the company in exchange for all of the shares of the old stock then issued and outstanding, and, thereafter, the holdings of the four stockholders were as follows:

|  | Shares | Percent |
|---|---|---|
| Louis P. Hanson | 147,960 | 32.88 |
| Howard H. Suskin | 147,960 | 32.88 |
| Martin K. Lilleberg | 77,040 | 17.12 |
| Jake Graybeal | 77,040 | 17.12 |
| Total | 450,000 | 100 |

In February 1959, 200,000 shares of petitioner's $1-par-value common stock were sold at public offering at $14 per share. The petitioner received net proceeds from said sale in the amount of $2,580,000. Petitioner now has in excess of 2,000 stockholders.

In December 1959, the petitioner sold 5-percent convertible subordinated debentures on a public offering and received net proceeds from said sale in the amount of $2,425,000.

The accrued and unpaid salaries as of January 1, 1959, totaled $328,968.71. The credit agreement as of this date continued to subordinate the indebtedness to the officers to that of the bank, but removed all limitations on cash payment of salaries for the fiscal year ending August 31, 1959. All authorized salaries for that fiscal year were paid in full.

In the credit agreement effective on January 1, 1960, there were no restrictions on the payment of the accrued officers' salaries from prior years. These amounts have not been paid.

The officers of petitioner have not forgiven any part of this indebtedness and they fully expect to receive the full amounts of money owed to them by petitioner for the unpaid salaries during the previous years. Petitioner intends to initiate the payments on this indebtedness in the fiscal year ending August 31, 1962.

Petitioner filed its Federal income tax returns for the fiscal years ended August 31, 1954, 1955, and 1956, with the director of internal revenue, Tacoma, Washington.

Petitioner's books of account and Federal income tax returns were prepared on an accrual basis of accounting and on a fiscal year ending August 31.

During the fiscal years ending August 31, 1954, 1955, and 1956, the only years in issue, the total amount of salaries authorized by the board of directors was accrued by the petitioner as an ordinary and necessary expense of business on its books and records, and such amounts were fully deducted for income tax purposes in the respective years. The amounts of said authorized salaries which were not paid were set forth on its books and records as an account payable to its officers for salaries.

In his deficiency determination respondent disallowed all claimed deductions for salaries for the fiscal years ended August 31, 1954, 1955, and 1956, in excess of the amounts actually paid out as salaries during each of these years. The amounts disallowed as deductions for salaries were as follows:

| Fiscal year ended Aug. 31— | Disallowed |
|---|---|
| 1954 | $56,500 |
| 1955 | 56,500 |
| 1956 | 47,500 |

The entire amount of authorized salaries each year was an ordinary and necessary expense of petitioner's business. The unpaid salaries during each of these years were properly accruable liabilities and were properly deducted by petitioner together with the paid salaries as an ordinary and necessary business expense.

### OPINION.

During the fiscal years ended August 31, 1954, 1955, and 1956, petitioner, maintaining an accrual basis of accounting, accrued on its books a liability to its four officers for salaries which were authorized but unpaid during each of these years, and included such unpaid salaries in its deductions for officers' salaries on its income tax returns for each of these years. Respondent has disallowed as a deduction all amounts in excess of the salaries actually paid to the officers during each of these years. While he concedes that petitioner maintained an accrual basis of accounting during the years in issue, that the unpaid salaries were properly accrued on petitioner's books and records, and that the entire amount of authorized salaries deducted each year were reasonable, he contends that the accrued and unpaid salaries as of the end of each of these years did not represent properly accruable liabilities and, therefore, could not be the basis of valid expense deductions. Whether such unpaid salaries as of the end of each of the years in issue were the subject of a proper accrual is the only issue before us.

The primary prerequisites of an accruable liability are: (1) The liability must be binding and enforcible, (2) the liability must not be contingent upon the happening of a future contingent event, (3) the amount of the liability must be certain, and (4) there must be a reasonable belief on the part of the debtor that the liability will be paid in due course. *Dixie Pine Products Co.* v. *Commissioner*, 320 U.S. 516 (1943); *Helvering* v. *Russian Finance & Construction Corporation*, 77 F. 2d 324 (C.A. 2, 1935), affirming a Memorandum Opinion of this Court; *Harrington Co.*, 6 T.C. 720 (1946); *Smith-Lustig Paper Box Manufacturing Co.*, 1 T.C. 503 (1943).

Respondent attacks the accrual of the unpaid salaries on three of these four fronts, conceding only that the amount of the liability accrued each year was certain. First, he maintains that the unpaid salaries during each of the years in issue were authorized in violation of the credit agreements then in effect, and that, inasmuch as the officers had knowledge of such prohibition, the excessive authorizations were invalid and could not give rise to an enforcible debt which petitioner could properly accrue on its books.

Inasmuch as the contents of the credit agreements were known to the officers, there is little doubt that if the credit agreements did prohibit petitioner from authorizing the unpaid salaries, petitioner would not be liable to pay such higher salaries and, therefore, could not deduct such unpaid amounts as an accrued liability. *Smith-Lustig Paper Box Manufacturing Co., supra* at 507.

Conversely, if the credit agreements merely limited the amounts which could be paid out each year as salaries, rather than the total amount of salaries which could be authorized, petitioner would be fully liable to pay the entire amount authorized, with only actual payment of the portion exceeding the limitation being deferred. *Lamm Lumber Co.*, 45 B.T.A. 1 (1941), affirmed without discussing this issue 133 F.2d 433 (C.A. 9, 1943).

The only clause in all of the credit agreements directly related to officers' salaries is entitled: "Payments to Officers and Shareholders." Such clause provides that the "Bank approves and consents to the payment of an annual salary" of specified amounts to each of the officers, and that "No other compensation, salaries or cash withdrawals shall be paid to or made by any of the officers or shareholders of Borrower [petitioner], and no dividends or bonuses shall be *declared* or *paid* by Borrower without the prior written consent of Bank." (Emphasis supplied.)

While this section specifically prohibits the declaration and payment of dividends and bonuses, it is pertinent to note that there is no prohibition or limitation concerning the salaries which could be authorized, but only the amounts which could be paid each year in salaries. We believe that this section, taken alone, could not rea-

sonably be interpreted as limiting the amount of salaries which could be authorized, as opposed to the amounts which could be paid each year to the officers as salaries.

The above interpretation is the same as that intended by the bank. The vice president of the bank during the years in issue who negotiated the credit agreements for the bank testified that there was never any intent on the part of the bank to restrict the amounts of officers' salaries which could be authorized.

This absence of any intent on the part of the bank to limit the amount of salaries which could be authorized each year is clearly shown by the fact that in each of the credit agreements, the subordination clause acknowledged that there was accruing on petitioner's books a binding liability to its officers for unpaid salaries in excess of the amounts allowed to be paid under the credit agreements.

In addition, by means of the annual letters requesting authority from the bank to pay out the accrued and unpaid salaries, the bank became fully aware of petitioner's practice of authorizing salaries in excess of the limitations in the credit agreements and, while it refused permission to pay these salaries until a later time, it did not ever object to petitioner's practice of authorizing such salaries.

Respondent, nevertheless, relies upon another clause in each of the credit agreements which provides that petitioner "shall not borrow from or otherwise incur any indebtedness outside of or in addition to the advances" of the bank, without the prior written consent of the bank except for the creation of trade accounts common and usual in its business.

Respondent maintains that inasmuch as petitioner authorized salaries in excess of amounts which it could pay each year, it was incurring an indebtedness within the meaning of this clause and such indebtedness is, therefore, prohibited. We cannot agree.

First, we believe that if it was the intent of the bank to limit the amount of salaries which could be authorized, an intent which we have seen was not present, such limitation would have been specifically provided for in the clause directly covering officers' salaries rather than in a general clause of this nature.

Secondly, and of greater significance is the generality of the clause in question. Had this clause been limited to prohibiting petitioner from incurring indebtedness which it was not permitted to discharge under the credit agreements, we might have agreed with respondent that the authorization of salaries in excess of that specifically allowed to be paid would be prohibited. The clause, however, goes further and prohibits the incurrence of *any* indebtedness, except for trade accounts. Should indebtedness to officers for services rendered be brought within the scope of such clause, as respondent contends? We think not. There is no basis from which to draw any distinction

between indebtedness for salaries which petitioner could and could not pay out under the credit agreements. Therefore, under respondent's interpretation of the clause, petitioner would even be prohibited from incurring indebtedness to its officers for salaries which it was allowed to pay under the credit agreements, but for some reason was unable to pay out when due. This interpretation, obviously, was not intended by the parties. We believe, based upon the record before us, that the "indebtedness" which petitioner was prohibited from incurring was limited to debts arising from loans, advances, or purchases rather than debts to its officers or employees for services rendered. We conclude, therefore, that the credit agreements in effect during the years in issue did in no way restrict petitioner in its authorization of officers' salaries, nor prohibit it from incurring indebtedness to them for such authorized salaries. Therefore, the full amount of the authorized salaries each year was a binding and enforcible liability of petitioner.

On his next front, respondent attacks the liability for the unpaid salaries as being contingent and, therefore, not the subject of a valid accrual.

During each of the years in issue, petitioner's duly constituted board of directors declared, approved, and authorized total officers' salaries in the amount of $96,500. No prior consent or condition was provided for by the board before such authorization would become a binding commitment upon petitioner. The fact that this liability was partially subordinated to the bank indebtedness did not cause the ultimate liability for such amount to be less fixed and binding. *Perkins Land & Lumber Co.*, 9 B.T.A. 528 (1927).

In the above case we stated, in part, as follows at page 533:

> It is in evidence and uncontroverted that the three officers were men of long experience and of demonstrated abilities. The services were actually rendered, the salaries were duly authorized by appropriate action of the board of directors, and the salaries incurred were accrued upon the books of account of petitioner. * * * We are unable to agree with the contention of respondent that the provision for deferment of the payment in cash of the liabilities of petitioner for these salaries until such time as the petitioner was possessed of sufficient cash to retire all its current liabilities operated to relieve petitioner of the liabilities. Petitioner was on the accrual basis and in our opinion, whether it quickly discharged in cash its liabilities for salaries is immaterial. We therefore conclude that the salaries of the three officers accrued upon the books and claimed as deductions from income should be allowed.

Finally, respondent contends that although the liability to pay the unpaid salaries was enforcible, and not contingent, the subordination of such indebtedness made the eventual payment of such indebtedness too remote and uncertain and, therefore, not the proper subject of an accrual.

While absolute certainty that the unpaid salaries would ever be paid is not required, there must have been, as of the end of each of the

years in issue, a reasonable expectation on the part of petitioner that such salaries would be paid in due course. *Helvering* v. *Russian Finance & Construction Corporation*, 77 F. 2d 324 (C.A. 2, 1935), affirming a Memorandum Opinion of this Court.

The certified public accountant retained by petitioner during the fiscal years in issue testified that he believed the unpaid salaries to be "a fixed liability of the corporation," that such accrued and unpaid salaries were entered on the books and records of the company as an accounts payable to officers; that there was no reason that he knew of, but for the credit agreements restrictions, that the company could not pay the full amount of authorized salaries each year, and that had the authorized salaries been paid each year, "it would have had very little effect" on the operation of petitioner.

Three of the four officers testified at the trial. All testified that they knew of no reasons as of the end of each of the years in issue, other than the credit agreement restrictions, why petitioner could not have paid the full amount of the authorized salaries, and that petitioner desired to pay the salaries in full.

The record shows that petitioner during the years in issue was a growing and prospering corporation; that it always had assets in excess of all of its liabilities, including the liabilities to its officers, and that it had an earned surplus of $94,775.17, $139,866.79, and $225,199-.28, as of the end of the fiscal years 1954, 1955, and 1956, respectively.

The minutes of the annual board of directors meetings and the annual letters to the bank requesting authority to pay the authorized salaries clearly evidence an intent on the part of petitioner to pay its liability as soon as consent was received or the bank indebtedness was liquidated. While petitioner may not reasonably have anticipated that the bank would ever give its consent to such payment while its loan remained outstanding, we believe that, in the light of petitioner's financial history and condition during the years in issue, it was reasonably justified in believing that in due course the bank loans would be liquidated and it would pay the accrued and unpaid salaries of the four officers. See *Lamm Lumber Co.*, *supra* at 9.

The desire and eventual ability to pay the full amount of the authorized salaries can be seen from the fact that when the cash outlay restrictions were finally raised for the fiscal year ended August 31, 1956, petitioner also increased the amount of salaries which were paid to its officers that year. Also, when all limitations on the cash salaries were ended for the fiscal year ended August 31, 1959, petitioner paid the full amount of the authorized salaries for that year.

Respondent relies on the fact that while the restrictions concerning the payment of the accrued and unpaid salaries were finally removed on January 1, 1960, petitioner has not paid any part of this amount.

It is clear under the circumstances of the instant case that petitioner's actions or inaction in subsequent years can have no significant bearing upon its right to a deduction in prior years. Such deductions must be viewed in the light of events known or reasonably to be anticipated at the end of the fiscal years in issue. *Helvering* v. *Russian Finance & Construction Corporation, supra* at 327. Moreover, we cannot agree with the factual basis urged by respondent to indicate that petitioner never intended to pay the accrued salaries even as of the end of each of the years in issue. There is no evidence of any attempted evasion or abuse here. Petitioner's business manager and treasurer testified that the main reason that petitioner had not yet initiated payment of the accrued salaries of prior years is that it was advised that the instant case would place in issue the reasonableness of the officers' salaries and that it would be, therefore, more prudent to withhold initiation of the payment of these unpaid salaries until a determination could be made in order to eliminate any exposure to possible stockholder suits if such salaries were held to be unreasonable. He also testified that it was petitioner's intention to initiate the payment of the unpaid salaries during the fiscal year ending August 31, 1960.

The record shows that respondent at first did determine the authorized salaries to be unreasonable, but conceded this issue before trial. Under these circumstances, we do not think it was unreasonable for petitioner to have temporarily deferred the payment of the balance of the unpaid salaries even after removal of the restrictions on payment.

Respondent's reliance upon *Commissioner* v. *Brooklyn Radio Service Corporation*, 79 F. 2d 833 (C.A. 2, 1935), reversing 31 B.T.A. 269 (1934), to bolster his offensive on this final front, we believe, is misdirected, inasmuch as the facts in that case are clearly distinguishable from the instant case. In that case the authorized bonus to its president was "not to be paid to him as long as the corporation is indebted to Finance Companies on account of its own insufficiency of working capital or to any banks," and the debt was also subordinated "to the indebtedness to all other creditors" of the taxpayer. The taxpayer, the court emphasized, did not even deem such unpaid bonus to be a fixed liability on its books and records during the year involved. In addition, the treating of such unpaid bonus as a liability would have created a deficit for the year in issue, and the liabilities as of the end of the year to which the bonus was subordinated amounted to about 80 percent of the total assets.

The court also emphasized the fact that the taxpayer might always be indebted to banks and finance companies and always have other creditors so there was no reasonable justification for the belief that the bonus would ever be paid except possibly upon liquidation of the

taxpayer, and then in an amount uncertain due to the taxpayer's poor financial history.

In the instant case, on the other hand, the taxpayer was a growing and prospering corporation which had substantial earned surplus even after treating the unpaid salaries as liabilities on its books and records and the bank debt to which the unpaid salaries was subordinated was never greater than about one-third of petitioner's total assets. The prospect of petitioner eventually paying the full amount of its liability for unpaid salaries was clearly far greater than the taxpayer's in *Brooklyn Radio Service* case which could not pay the bonus as long as it had any other debts outstanding, a situation which even the most optimistic of businessmen rarely ever hope to achieve.

We conclude, therefore, that the unpaid salaries as of the end of each of the years in issue represented an enforcible liability of petitioner which was not contingent, and that petitioner was reasonably justified in believing that it would pay such liability in due course. Therefore, we believe that such unpaid salaries were properly accruable each year on its books and records and properly claimed as a deduction on its income tax returns for each of the years in issue as an ordinary and necessary business expense.

Because of other issues raised in the notice of deficiency which have been conceded,

*Decision will be entered under Rule 50.*