MARVIN L. POPKIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Popkin v. Commissioner
Docket No. 876-83
United States Tax Court
T.C. Memo 1988-459; 1988 Tax Ct. Memo LEXIS 503; 56 T.C.M. (CCH) 294; T.C.M. (RIA) 88459; September 22, 1988
Samuel S. Forman, for the petitioner. Bonnie L. Rosner, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a notice of deficiency dated October 13, 1982, determined a deficiency in petitioner's income tax of $ 201,784 and an addition under section 6653(b) [1] of $ 100,892 for taxable year 1978. Because petitioner has conceded the amount of the income tax deficiency, the only issue left for consideration is whether petitioner is liable for the fraud addition under section 6653(b). *504 FINDINGS OF FACT At the time the petition was filed in this case, petitioner resided in Miami Beach, Florida. Petitioner's tax return for the 1978 taxable year was filed on October 15, 1979. The stipulation of facts and attached exhibits are incorporated herein by this reference. From 1974 to 1979, petitioner was a promoter and/or investor in numerous tax shelters. Promotion of such shelters was his principal source of income. Petitioner, directly or indirectly (through other partnerships or corporations), was the general partner of many limited partnership tax shelters. Petitioner's participation will be discussed under four broad categories of shelters: (1) Movies; (2) coal; (3) lithographs; and (4) books. Movies
From 1974 to 1976, petitioner, with the assistance of an attorney, Milton Fried (Fried), purchased various movies through limited partnership vehicles and sold limited partnership interests to investors. Petitioner promoted and was the general partner, directly or indirectly, [2] of the following movie ventures: Partnership
Name of Movie(s)
Sea Properties, Ltd.
The Sky is Falling
Lakeview Properties, Ltd.
The Heroes
Bijoux Properties, Inc.
Family Jewels
River Properties, Ltd.
Violent City
Islandview Properties, Ltd.
Evil Eye
Oceanview Properties, Ltd. *
Parkview Properties, Ltd.
Open Season
Wolf Properties, Ltd.
Larson, Wolf of the Seven
Seas
Wizard Properties, Ltd. *
Dorian Properties, Ltd.
Billions For a Blonde
Return of White Fang
*505 The purchase price of the movies was financed largely with nonrecourse notes. All of the partnerships showed large losses on their partnership returns, which losses the partners presumably claimed on their individual tax returns. The partners also took investment tax credits based on the purchase price of the movies. The partnerships had nominal amounts of gross income. Coal
In the latter part of 1976, petitioner and Fried began to investigate the possibility of promoting coal tax shelters. Petitioner was investigating coal investments at this time in order to salvage some movie partnerships that had already been formed but were to be adversely affected by retroactive changes in the tax law. Petitioner met Bob Slatko (Slatko) in the latter part of 1976, who with Bob Libman (Libman) had put together a number of "coal mine situations." Slatko and Libman were in a desperate financial position, having exhausted all of their funds waiting for other coal deals to come to fruition. *506 Slatko and Libman engaged in business through the Southeast Energy Corporation (Southeast). Apparently, although this is not entirely clear from the record, Southeast acted as an adviser or intermediary between the lessor and mining company entities, owned by Walter Childers (Childers), and the Popkin entities. Childers played a dual role in these transactions. In addition to being a lessor sublessor to the Popkin partnerships, he also controlled the entity that was to undertake the actual mining. Petitioner and Fried paid $ 50,000 to Slatko and Libman, apparently for a package of rights with respect to mining property located in Hancock County, Kentucky. Petitioner and Fried subsequently organized Arnett Mining Company, Ltd., a Florida limited partnership, to take advantage of the opportunity. Realty Marketing Group, Inc. (Realty Marketing), petitioner's wholly owned subsidiary, became the general partner of Arnett. In addition, petitioner was a limited partner in Arnett, investing a $ 37,500 recourse promissory note. The Arnett venture was sold to investors through a "confidential descriptive memorandum" (prospectus). It is unclear to what extent petitioner was involved *507 in setting up the program, i.e., whether he merely bought a "prepackaged" shelter from Libman and Slatko or whether he prepared the prospectus and other materials. It is clear, however, that petitioner promoted and sold tax shelters and was general partner and on occasion, a limited partner-investor, in the entities. Petitioner "operated" the shelter business entity and made various representations to "investors," both before and after "investment." The prospectus described the Arnett program. The partnership anticipated raising $ 1,500,000 through the sale of 60 units at $ 25,000 per unit. Pursuant to a sublease, the partnership acquired, from Scott Land Company, Inc. (Scott), the exclusive right to remove coal on a 55-acre tract located in Hancock County, Kentucky. An advance royalty was due under the sublease of $ 5,500,000 -- $ 1,000,000 cash and a $ 4,500,000 nonrecourse promissory note. Because the partnership was undersubscribed, the promissory note was unilaterally reduced to $ 3,785,000. Petitioner, as president of Realty Marketing, signed the promissory note, which was dated December 31, 1976. The promissory note was never delivered to Scott. No mining activity *508 ever took place on the land leased by Arnett. Childers, in addition to being the president of Scott, had executed a contract to mine coal on the property but did not do so because "money was not available." Petitioner was aware that no mining activity took place, but did not complain to Childers. It is unclear who was to provide the funds to mine the property, although Southeast seems to be a possible candidate. Realty Marketing resigned as general partner because no mining was taking place. By letter dated September 23, 1977, petitioner wrote to a limited partner, Leonard J. Robinowitz, stating that "Mining operations have commenced at the Arnett Mine in Greenup County, [3]Kentucky," and that coal has been shipped and "Arnett mining will be receiving its first cash income during early November." Further, the letter stated "As soon as any income is available, we expect to make a token distribution to investors in order to establish (for purposes of their 1977 returns) that operations have begun." On its partnership returns for *509 1976, Arnett showed a deduction for the advance royalty payment of $ 4,432,000. For 1977 and 1978, the partnership accrued interest expense of $ 227,100 each year on the promissory note to Scott. In addition, in 1977 Arnett had its only income, $ 8,500 in gross sales. Petitioner, in his capacity as limited partner, claimed his distributive share of Arnett's losses. In addition to the Arnett deal, shortly prior to October 29, 1976, petitioner made a deposit of $ 5,000 to acquire an interest in another coal property known as the Bodenheimer tract. Petitioner planned to place the interest into two movie partnerships, Alpine Properties, Ltd., and Mountainview Properties, Ltd., because movie investments were to be adversely affected by retroactive 1976 legislation. Childers, as president of Cannel Log, Inc., and petitioner, as president of Financial Advisory Group, Inc. (Financial), executed a lease agreement for the Bodenheimer tract. Financial was to pay Cannel Log, Inc., $ 50,000 cash as an advance royalty payment. The initial lease was dated October 26, 1976. This lease was backdated on or after October 29, 1976. Financial then executed a lease on the Bodenheimer tract *510 with the Alpine, Mountainview and Popkin-Fried partnerships. These partnerships formed the new Mountpine Properties partnership. The partnerships were to pay $ 3,000,000 to Financial in advance royalties, $ 50,000 cash and a $ 2,950,000 promissory note. This second lease was dated October 27, 1976. The lease between Financial and Cannel Log was not executed prior to October 29, 1976. Childers only received $ 5,000 of the $ 50,000 advance royalty. There was no attempt to mine the Bodenheimer tract. In this instance, also, a company controlled by Childers was apparently supposed to do the mining, but received no funds. Again, Southeast may have been the party responsible to pay the mining company, but the record is sparse on this point. The Mountpine Properties partnership return for 1976 reflected the advanced royalty deduction of $ 3,001,000. In 1977, 1978 and 1979, the Mountpine returns showed interest expense of $ 177,000 on the promissory note and $ 5,000 royalty deductions. On October 29, 1976, the Internal Revenue Service issued News Release IR-1687. This release announced a proposed amendment to the regulations, providing that advanced royalties could be deducted *511 only in the year the mineral product is sold. The amendment would be effective October 29, 1976, unless the royalties were paid pursuant to a lease or written contract binding prior to that date. Petitioner knew about the proposed amendment and its contents prior to its release. Lithographs
During the years 1977 through 1979, petitioner promoted lithographs produced by Dr. Ferdie Pacheco. Petitioner would tell prospective investors that they would be saving on their taxes through the lithograph investment. When petitioner sold the lithographs, investors would provide a nonrecourse note as part of the purchase price, payable to M. Popkin and Associates, Ltd. (Associates), an entity formed by petitioner. As part of its accounting policy, Associates started a 90 to 100-percent reserve account for these notes receivable, reflecting the belief that all or most of these notes would not be collected. Books
In 1977 and 1978, petitioner claimed losses from an investment in two books entitled "Fight Doctor" and "Yellow Kid." Petitioner allegedly acquired the rights to the books on August 22, 1977, for $ 450,000, $ 50,000 cash and the balance nonrecourse notes. Petitioner *512 claimed losses from the book investment of $ 81,344 and $ 111,955 for 1977 and 1978, respectively. In 1978 the books generated gross receipts of $ 1,970. With respect to all the shelters (books, coal, lithographs, movies), petitioner did not obtain independent appraisals or cash flow projections for the respective assets involved. Prior to trial in this case, on July 2, 1986, respondent served interrogatories and a request for production of documents on petitioner. The request asked for all books and records relating to the partnerships petitioner promoted. On September 25, 1986, upon respondent's motion, we issued an order to compel petitioner to comply with the discovery requests and production of documents. Petitioner replied on November 10, 1986, claiming none of the documents were in his possession. In addition, the interrogatories were returned with a number of inadequate answers. Respondent moved to impose sanctions, attaching to the motion, among other things, the answers to the interrogatories and a notice of compliance by Milton Fried stating that the documents in question had been released to petitioner. Petitioner failed to appear in response to an order to *513 show cause issued by this court and on January 14, 1987, we issued an order that petitioner would not be able to rely on documents not produced or material related to answer deemed inadequate in the interrogatories, as they related to the underlying income tax deficiency. OPINION Section 6653(b) provides for a 50-percent addition to tax if any part of any underpayment is due to fraud. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Powell v. Granquist,252 F.2d 56 (9th Cir. 1958); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941); Estate of Pittard v. Commissioner,69 T.C. 391 (1977). The burden is on respondent to prove, by clear and convincing evidence, that some part of an underpayment of tax is due to fraud. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213 (1971). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Mensik v. Commissioner,328 F.2d 147 (7th Cir. 1964), *514 affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964). Fraud is never presumed, but rather must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner,55 T.C. 85 (1970). Fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. Spies v. United States,317 U.S. 492 (1943); Rowlee v. Commissioner,80 T.C. 1111 (1983); Stephenson v. Commissioner,79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Rowlee v. Commissioner, supra,Stone v. Commissioner, supra.
A fraudulent understatement of income can be accomplished by an overstatement of deductions. Drobny v. Commissioner,86 T.C. 1326 (1986); Professional Services v. Commissioner,79 T.C. 888 (1982); Hicks Co. v. Commissioner,56 T.C. 982 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner,52 T.C. 532 (1969), *515 affd. 424 F.2d 639 (2d Cir. 1970), cert. denied 400 U.S. 827 (1970). The question in this case is whether the losses on petitioner's 1978 return attributable to the tax shelter activity were deducted with the willful intent to evade tax. Respondent relies on circumstantial evidence to prove the requisite fraudulent intent. As part of the circumstantial case respondent asserts that petitioner engaged in a systematic and methodological scheme -- utilizing illusory nonrecourse notes to maximize mythical losses against earned and taxable income. Respondent has attempted to show one indicia of fraud by a consistent pattern of understatements of income by proving lack of profit motive for years other than the one in issue. See Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Merritt v. Commissioner,301 F.2d 484 (5th Cir. 1962), affg. T.C. Memo. 1959-172. Respondent argues that investment in or sale of a number of tax shelters, all of which produce tax losses, is per se fraudulent. Although we do not accept respondent's argument in this case, respondent has proven *516 fraud by clear and convincing evidence. "The fraud which the Commissioner [is] required to prove to sustain the penalty is actual and intentional wrongdoing with a specific intent to evade the tax." Goldberg v. Commissioner,239 F.2d 316 (5th Cir. 1956); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941). Respondent has presented evidence, in addition to petitioner's promotion of tax shelters, which support a finding of fraud for 1978. Understating income is one indicia of fraud. Bradford v. Commissioner, supra at 307. Merritt v. Commissioner, supra;Archer v. Commissioner,227 F.2d 270 (5th Cir. 1955), affg. a Memorandum Opinion of this Court dated February 18, 1954. Respondent, by concession, has proven an understatement for 1978. While petitioner normally bears the burden of proof with respect to deficiencies, Rule 142(a), respondent did not, to our knowledge, determine any deficiencies for years other than 1978. In addition, respondent bears the burden of proving fraud. Therefore, if respondent wishes to rely on understatements for years other than 1978, respondent must shoulder the burden *517 of proof with respect to those years. The understatements will be dealt with by category of shelter. Petitioner claimed losses with respect to a number of movie shelters from 1974 to 1978. Respondent asserts that because the movies were purchased with nonrecourse financing, petitioner did not obtain appraisals or other projections, and the movies did not show a profit that the deals were without substance or profit objective. While those are relevant factors, see Soriano v. Commissioner,90 T.C. 44 (1988), and Beck v. Commissioner,85 T.C. 557 (1985), respondent failed to produce any other evidence that the movie purchases lacked substance or were entered into without profit objective, including evidence of activity (or lack of activity) by petitioner in marketing and distribution and evidence of fair market value of the movies, which would be highly probative. Petitioner testified that well known actors starred in the movies. In addition, we think petitioner's ex-wife's testimony that the movies were "four-walled" [4] is unreliable, given her animosity toward her ex-husband. Under these circumstances, respondent has not proven that there were *518 necessarily understatements attributable to the movie transactions. Moreover, even if respondent has proven understatements, the lack of more specific details would preclude us from giving this much weight. Respondent devoted a substantial portion of his brief to lithograph shelters. However, as far as we can tell, no deductions or credits from the lithograph venture were taken by petitioner on his 1978 return. In addition, it was not shown how the lithograph venture created underpayments attributable to petitioner's returns for other years. Respondent's proposed findings of fact indicate that the lithographs were sold to other investors. Thus, respondent has not proven understatements with respect to petitioner's returns attributable to the lithograph venture. However, respondent has proven that petitioner did not believe the nonrecourse notes given by investors would be collectible. This may be reflective of petitioner's tax shelter activity in general and, as such, we give it some weight. The book shelter activity suffers from the same *519 disabilities as the movie activity. While respondent has proven an understatement for 1978, large gaps in information for the other years preclude us from finding an understatement attributable to the book activity in those years. However, petitioner's coal shelter activity provides the clearest and most convincing indicia of fraudulent understatement. In 1976, petitioner failed to deliver the promissory note from Arnett to Scott. Nevertheless, petitioner, through Arnett, deducted his distributive share of the advanced royalty represented by the note and accrued interest deductions in later years, including 1978, based on the "indebtedness." All of the evidence indicates that petitioner knew the promissory note would not be paid, yet he continued to take the deductions based on the indebtedness. The function of the note was to generate large tax deductions for petitioner and the other investors. No mining ever took place, and petitioner was aware of this. Even so, there is no evidence that he complained to anyone, either Southeast or Walt Childers. Finally, and most poignantly, petitioner did not even deliver the note to Scott, because he knew he would not have to pay it. *520 In order for a liability to be accruable, there must be a reasonable belief on the part of the debtor that the liability will be paid. Herrick v. Commissioner,85 T.C. 237, 260 (1985), United Control Corp. v. Commissioner,38 T.C. 957 (1962). Under these circumstances, the debtor never intended to pay the note and the indebtedness was truly illusory. This is an attempt by the parties to obtain inflated royalty and interest deductions. In addition to establishing understatements, this is also substantial probative evidence of fraudulent intent to evade taxes. Accruing interest deductions on a note that has never been delivered is quite similar to deducting commissions that have never been paid. See Carlton Building Co. v. Commissioner,29 B.T.A. 599 (1933). This evidence is particularly probative because we can trace the interest on this illusory indebtedness directly to petitioner's 1978 return. In addition to the Arnett venture, there are also understatements, and indicia of fraud, attributable to the Bodenheimer lease. Walt Childers testified that the lease between Cannel Log and Financial Advisory Group could not have been *521 executed prior to October 29, 1976. Thus, with regard to the Bodenheimer tract, no advance royalty deduction would have been allowable. Sec. 1.612-3(b)(3), Income Tax Regs. Mountpine could not have had a binding contract until its lessor. Financial, had an interest in the property. Petitioner had either backdated the documentation, or was aware of same, in order to qualify for the advance royalty deduction. Manipulation of records in order to mislead or conceal is another indicia of an intent to evade tax. Bradford v. Commissioner,796 F.2d 303, 307 (9th Cir. 1986). Even though initially the regulation was proposed in the form of a News Release, petitioner did not subsequently amend his return when the regulation became final. In any event, petitioner intended that the tax authorities believe that a binding agreement was in effect on October 29, which was not the case. This behavior was intended to mislead or conceal, and indicative of fraud. Bradford v. Commissioner, supra at 307. Petitioner also did not cooperate with tax authorities in turning over his records, and answered interrogatories in an evasive and incomplete manner. This failure *522 to cooperate is another indicia of fraud. Bradford v. Commissioner, supra at 307. Petitioner argues that he relied on the advice of experienced attorneys and accountants in taking the deductions. All of the shelters had legal opinions supporting the deductibility of the losses. Therefore, petitioner argues, he could not have had the fraudulent intent. However, in order to negate fraudulent intent, it must be shown that all material facts were provided to such persons. United States v. Drape,668 F.2d 22 (1st Cir. 1982), United States v. Jett,352 F.2d 179 (6th Cir. 1965), cert. denied 383 U.S. 935 (1966). Among other things, petitioner did not tell the attorneys that the Arnett note was not delivered to Scott, and that the Bodenheimer lease was backdated. Benjamin Schwartz testified at trial that he would not have given an opinion if he had known that the Bodenheimer lease was backdated. In addition, we recognize that such opinions are commonly precatory, and dependent on things not in the opinion writer's control. In this case, petitioner can not use his reliance on others as a shield. These circumstances are *523 vastly different from those of an investor who may not know of the failure to mine coal or deliver the note. Here, petitioner was knowledgable of the actual facts and, moreover, he was the promoter-general partner. Petitioner, in this case, is not insulated from the transaction and also purportedly knowledgable about tax matters. In sum, based on all the evidence in the record in this case, we find that respondent was shown by clear and convincing evidence that a part of the understatement in petitioner's Federal income tax return for 1978 was fraudulent with the intent to evade tax. We note, however, we do not base our holding solely on mere promotion of "tax shelters." The majority of the evidence was based on partnership tax returns, and was not very specific. Only when considered in light of evidence of specific fraudulent intent, i.e., nondelivery of the promissory note and backdating of documents, is that relevant. In Hicks Co. v. Commissioner,56 T.C. 982 (1971), the finding of fraud was based on intentional deduction of expenditures the shareholders clearly knew were not in fact made. In Drobny v. Commissioner,86 T.C. 1326 (1986), *524 the shelter investment itself was not the sole basis for finding fraud. In that case, we found that loan proceeds to finance purported research and development expenditures were actually invested in short term notes and then repaid to the lender/banks. One highly relevant factor in finding the taxpayer, a promoter, liable for the fraud addition was that he knew the loan proceeds would not be used for research, and deductions based on the indebtedness were not allowable. Here, petitioner knew the Arnett note would not be paid, and petitioner intentionally backdated the Bodenheimer lease to obtain deductions otherwise not allowable. This is the actual and intentional wrongdoing upon which, in large part, we rely. Petitioner benefited from these events both in his promotion of the shelter investments, and more importantly to this issue, in claiming losses on his own return based upon information known to be incorrect. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The general partner of these ventures was usually the Popkin-Fried partnership or the Popkin-Fried-Rolnick partnership. * The name of these movies does not appear in the Form 1065.↩
3. The mine property, as described in the prospectus, was in Hancock County. No explanation was proffered by the parties for this discrepancy. ↩
4. "Four-walling" apparently involves paying a theatre owner to show a movie for a few weeks to give the appearance of legitimacy. ↩