SPRINGFIELD PRODUCTIONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Springfield Productions, Inc. v. Commissioner
Docket Nos. 6412-69, 7252-72.
United States Tax Court
T.C. Memo 1979-23; 1979 Tax Ct. Memo LEXIS 501; 38 T.C.M. (CCH) 74; T.C.M. (RIA) 79023; January 16, 1979, Filed M. D. Fraider, for the petitioner. John O. Kent, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases respondent determined the following deficiencies in petitioner's Federal income taxes: Fiscal Year Ending [1]
Income Tax October 31
Deficiency
1962
$ 41,590.29
1963
6,351,30
1964
28,219.92
1966
13,826.93
1967
59,586.64
In addition, respondent has determined, pursuant to section 6651(a), Internal Revenue Code, [2] an addition to tax in the amount of $ 6,238.54 for the fiscal tax year ending October 31, 1962. *506 Since the respondent has disallowed the application of net operating loss carryovers from the fiscal years 1960 and 1961 in computing the 1962 tax deficiency and the net operating loss carryover from 1965 in computing the tax deficiencies for 1966 and 1967, it is necessary in our resolution of this case to determine the validity of such net operating losses for 1960, 1961 and 1965 as they affect the years in issue. [3]
*507 Concessions having been made by both parties, the issues for decision [4] are: (1) Whether deferred compensation accrued on behalf of Dalton Trumbo for the fiscal years 1960, 1961, 1962, 1963, 1964 and 1965 is deductible in the year accrued or is subject to the provisions of section 404. (2) Whether $ 133,333.32 received by petitioner from MGM during the fiscal year 1965 is includible in petitioner's income in that year. (3) Whether petitioner's contribution to its employee profit sharing plan for the fiscal year 1965 was properly deductible in that year. (4) Whether petitioner is entitled to deduct $ 23,100 for worthless stories, story outlines and films in the fiscal year 1966. (5) Whether petitioner's contribution to its employee pension plan in the amount of $ 43,212.50 was properly deductible in the fiscal year 1967. (6) Whether petitioner is liable for the addition to tax pursuant to section 6651(a) for *508 the fiscal year 1962. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner is a corporation organized under the laws of the State of California on August 12, 1952. During the years in issue and at the time of filing the petitions in these consolidated cases, petitioner's principal office was in Beverly Hills, California. Petitioner was engaged in the business of developing story ideas and outlines into movie scripts and screenplays, promoting such scripts and screenplays to film producers, directing and producing films, and buying and selling completed story outlines, scripts and distribution rights to films. Although petitioner frequently purchased finished outlines or scripts and sold them to film producers, it also employed a number of writers to develop screenplays based upon a story idea or outline conceived by petitioner or obtained by purchase. Petitioner, an accrual basis taxpayer, filed income tax returns for the fiscal years 1952 through 1972, and reported income and losses as follows: Fiscal Year Ending
Taxable Income October 31
or (Loss)
1959
(2,115.26)
1960
(59,082.49)
1961
(72,753.73)
1962
14,593.10 *
1963
(57,698.99)
1964
(9,463.62)
1965
(226,661.51)
1966
14,151.29 *
1967
14,413.26 *
1968
(60,987.82)
1969
12,894.00
1970
(4,619.57)
1971
(32,895.00)
1972
(76,752.00)
$ 546,978.34
*509 1. Facts Relating to Deferred Compensation Accrued for Trumbo
On October 15, 1958, petitioner and Dalton Trumbo entered into a three year contract (containing an option which, if exercised by petitioner, would extend the agreement two years) in which Trumbo agreed to render his writing services to petitioner. The contract provided, interalia, that: 1. The producer retains and engages the writer to render his writing services to the Producer exclusively for a term of three (3) years commencing on the date of this agreement. And, as hereinafter provided, the Producer shall have the option and privilege of extending the term for a period of two (2) additional years. The Writer agrees to furnish his writing services exclusively to the Producer under the terms and conditions hereinafter set forth. * * *
3. During each year of the term of this agreement the Producer will assign to the Writer the creation and writing of no more than three (3) screenplays on subjects which are mutually acceptable *510 to the Producer and the Writer. The Writer agrees to render his services in the creation and writing of outlines, treatments and screenplays for motion pictures. 4. The Writer will render his services at such place or places, and at such time or times, as he, in his sole discretion, may determine. The Producer shall have neither control nor supervision over the Writers' working arrangements, nor over the hours, days or any of the details of the work of the Writer. Although the Producer may make suggestions concerning material, it shall have no right to require revisions or rewriting. Any determination as to the finality and completion of any work, or as to the necessity or desirability of revision shall be the Writer's alone and his decision shall be final. It is understood and agreed that the writer is not an employee of the Producer, but will be rendering his services as an independent contractor. * * *
9. The Producer agrees to furnish the Writer readily available transportation to and from story conferences, film viewings, meetings, and places where Writer needs or desires research materials. Producer further agrees to reimburse Writer, on demand, for all costs *511 and expenses paid or incurred by him in connection with services to be rendered hereunder. 10. The Producer expressly acknowledges that, among other things, in order to induce the Writer to execute this agreement, he promised and warranted the following: A. That the Writer would be assigned the writing and preparation of the screenplay for the proposed motion pictures entitled MONTEZUMA and the WILL ADAMS STORY; B. That he would arrange and secure for the Writer a loan to the Writer in any amount requested by the Writer up to a maximum of $ 40,000.00 upon terms which would require repayments in not less than two years with interest at the rate of no more than 6% per annum and requiring only a lien on the residence of the Writer as security. 11. The Writer agrees that the Producer may lend the Writer's services to any other person, firm or corporation during its term, and that, during any such loan-out, he will render his services to the borrower as provided herein. * * *
13. The Writer hereby gives and grants to the Producer the option and privilege of extending the original three-year term of this agreement for an additional two years, or a total of five (5). *512 The extended term, if any, shall be subject to all the provisions in this agreement set forth. The option may be exercised by the Producer by its mailing or giving to the Writer, at least 30 days before the expiration of the original term, notice of its intention to extend the term. In return for Trumbo's services, the contract provided that: 2. The Producer agrees to pay to the writer as compensation for the services required to be rendered and for all rights herein granted and agreed to be granted, the following: A. i. During the first year of the term, the sum of $ 50,000.00, payable $ 12,500.00 on the date hereof, $ 12,500.00 on or before January 15, 1959, $ 12,500.00 on or before April 15, 1959, and the balance of $ 12,500.00 on or before July 15, 1959; plus deferred compensation of $ 30,000.00 payable as hereinafter provided. ii. During each of the second and third years of the term, and during each of the fourth and fifth years of the term if the option to extend the term is exercised, the sum of $ 80,000.00, payable at the rate of $ 20,000.00 on each of the 15th days of October, January, April and July of the second and third years of the term, and on such days *513 of the fourth and fifth years of the term if the option to extend the term is exercised; plus deferred compensation for each of such years as follows; second year, $ 50,000.00; third year, $ 60,000.00; each of the fourth and fifth years if the term is extended, $ 80,000.00. B. The deferred compensation hereinafter provided shall be paid by the Producer to the Writer at the rate of $ 750.00 per week, beginning on Friday of the week following the expiration of the term of this agreement, and continuing at the rate of $ 750.00 on Friday of each succeeding week until the entire agragate [sic] amount of deferred compensation earned hereunder is paid. In 1961, petitioner exercised its option and extended its contract with Trumbo for an additional two years. The total compensation payable to Trumbo for the five year period was $ 670,000, of which $ 370,000 was to be currently paid and the balance ($ 300,000) to be accrued on the books of petitioner as a deferred compensation expense in the following manner: Fiscal Year Ending October 31
Amount
1959
$ 30,000
1960
50,000
1961
60,000
1962
80,000
1963
80,000
Pursuant to the agreement, payment of the deferred *514 compensation would begin upon the expiration of the term of the contract. Petitioner did not initially accrue the $ 30,000 deferred compensation in 1959, however, but added that amount to the $ 50,000 accrued in 1960 and deducted $ 80,000 on its 1960 income tax return. Moreover, petitioner accrued a deferred fee of $ 80,000 in 1961 rather than the $ 60,000 specified in the contract and deducted $ 80,000 on its 1961 return. In 1962 and 1963, petitioner accrued $ 80,000 on its books and deducted the same amount on its 1962 and 1963 income tax returns. On July 20, 1963, petitioner and Trumbo entered into an extension of their 1958 agreement. The parties agreed that the 1958 agreement would be extended for an additional three year period on the same terms and conditions enumerated in the 1958 agreement. It was further agreed that Trumbo's compensation, both current and deferred, would be the same as in the fourth and fifth years of the 1958 agreement. Thus, petitioner accrued on its books a deferred compensation fee of $ 80,000 in both 1964 and 1965, and likewise deducted those amounts on its 1964 and 1965 income tax returns. Under the 1963 extension petitioner's future payment *515 schedule of accrued deferred compensation was modified as follows: (b) Deferred compensation provided in Subsection 2B [of the 1958 agreement] shall be deferred and paid as follows: At the rate of $ 10,000 per year for six years payable on December 31 of each year beginning December 31, 1964; thereafter at the rate of $ 60,000 per year payable on December 31 of each year beginning December 31, 1970 and continuing from year to year thereafter until fully paid. Subsequently, on September 15, 1965, petitioner and Trumbo amended the 1963 extension of their agreement to provide: (a) That the payment of deferred salary has been amended in the following particulars: (1) Dalton Trumbo will be paid the sum of $ 20,000.00 accrued in each year. (2) Dalton Trumbo will be party to the Profit Sharing agreement and the Retirement Plan. (3) Dalton Trumbo will be entitled to medical benefits paid for by the Corporation. (b) The foregoing will go into effect as of January 1, 1965 and will continue till October 30, 1970. The 1958 agreement, as extended and modified, provided that Trumbo would be considered an independent contractor and not an employee of petitioner. In accordance *516 with the agreement, petitioner did not tell Trumbo where or when to write, nor did it require him to perform his services at its office. In fact, Trumbo usually wrote at home. Although petitioner could not, under the contract, require Trumbo to rewrite or revise work it found unsatisfactory, petitioner did retain the power to tell Trumbo what ideas or novels were to be adapted for the screen. In the 1958 contract certain stories to be adapted for the screen were delineated as part of Trumbo's services to petitioner. Nonetheless, petitioner exercised no control over the manner or the style in which Trumbo wrote the screenplays. Petitioner furnished Trumbo readily available transportation to any place that Trumbo believed necessary to properly perform his services; likewise the petitioner reimbursed Trumbo for all costs and expenses incurred in connection with his job performance. Petitioner also provided a secretary to Trumbo. While under contract with petitioner, Trumbo did not make himself available to any other production company and did not offer his services to the general public. Pursuant to their 1958 agreement, petitioner loaned Trumbo to Metro-Goldwyn-Mayer, Inc. *517 in 1965, 1966 and 1967 for the purpose of adapting three stories into screenplays. Petitioner filed W-2 withholding statements with respect to compensation paid Trumbo in 1966 and 1967. In addition, Trumbo was made a participant in petitioner's Profit Sharing Plan, established in 1964 and petitioner's Pension and Retirement Plan, established in the same year. To be eligible for the profit sharing plan, a participant had to have two or more years of service as an employee for petitioner. Under the terms of the trust instrument, "employee" was defined as one "whose service was not intended to terminate on the completion of a certain job for which he was employed, or at the end of a specifically limited period." Similar requirements were present in the retirement Plan. In 1965, petitioner made a contribution to the profit sharing account of Dalton Trumbo, and in petitioner's Statement in Support of Deduction to a Profit Sharing Plan filed with its 1965 return, Trumbo was listed as having been an employee of petitioner for 13 years. Similarly, Trumbo was listed as a 14-year employee in petitioner's Statement of Support of Deduction to a Pension Plan filed with its 1967 income tax *518 return. 2. Facts Relating to Amounts Received from MGM
On June 8, 1965, petitioner entered into an agreement with Metro-Goldwyn-Mayer, Inc. (hereinafter MGM) in which petitioner agreed to loan the services of Trumbo to MGM to write a screenplay based upon the novel Wanderers Eastward, Wanderers West.
Delivery of the screenplay was promised for September, 1965. In payment for such services petitioner received $ 133,333.32 from MGM during the summer of 1965.When MGM requested the script in September, petitioner was unable to deliver it since Trumbo had not started work on the screenplay. As a result, MGM demanded an immediate cash refund. Petitioner, however, indicated to MGM that such a refund would be impossible at that time since petitioner did not have sufficient cash available. The parties negotiated a verbal agreement which was subsequently formalized on March 11, 1966. The terms of the agreement were as follows: 1. The agreement whereby you loaned us the services of Dalton Trumbo to write a screenplay based upon WANDERERS EAST-WARD, WANDERERS WEST has been terminated by mutual agreement.We paid you $ 133,333.32 under that agreement and such payment *519 shall be refunded by you to us as stated below. 2. You have loaned us the services of Dalton Trumbo to write a script based upon the novel GABRIELA commencing as of February 25, 1966 on exactly the same terms as the loanout of his services for WANDERERS EASTWARD, WANDERERS WEST including compensation of $ 200,000.00 payable in 6 equal installments of $ 33,333.33 each. We will prepare and submit to you and you [sic] and we will execute a formal contract convering the loanout. 3. The sum of $ 133,333.32 referred to in item 1 above shall be recouped by us as follows: a) $ 27,777.78 shall be recouped from the compensation payable by us to you for Mr. Trumbo's services in connection with GABRIELA, pro rata out of each installment of such compensation. b) $ 27,777.78 shall be recouped out of the compensation which will become payable by us to you for furnishing Mr. Trumbo's services in the writing of each of 2 additional screenplays, * * when and if written, likewise in equal pro rata installments in each case. In other words, $ 27,777.78 will be so recouped in the first such case, and $ 27,777.78 in the second such case. c) Provided that Mr. Trumbo fully performs his services *520 in connection with GABRIELA the remaining $ 50,000.00 of the indebtedness will be forgiven upon the completion of such services. * * *
Petitioner treated the termination of the Wanderers Eastward, Wanderers West agreement and the subsequent loanout agreement as separate and distinct. Accordingly, petitioner did not treat the $ 133,333.32 as an advance for future services, but rather as a liability owed MGM.Consistent with this treatment as a liability, petitioner set up a liability due MGM at the close of the 1965 fiscal year in the amount of $ 133,333.32. Pursuant to the agreement, petitioner made payments to MGM during the 1966 fiscal year in the amount of $ 27,777.78 as follows: Date
Amount
April 1, 1966
$ 4,629.63
May 2, 1966
4,629.63
May 31, 1966
4,629.63
June 13, 1966
4,629.63
July 26, 1966
4,629.63
October 31, 1966
4,629.63
Such "repayments" were made by reducing the amount forwarded by MGM to petitioner on the subsequent agreement loaning Trumbo's services to write a screen adaption of Gabriela. In August 1966, petitioner and MGM formalized the loanout of Trumbo to write Gabriela and two other screenplays. The agreement *521 provided, inter alia, that: * * *
(d) Reference is also hereby made to that certain two (2) page letter agreement between you and us also dated March 11, 1966, (hereinafter referred to as the "refund letter") whereby certain monies paid by us to you pursuant to the Wanderers loan-out agreement are to be considered advances to you and are to be refunded by you to us as therein provided. * * *
NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the documents referred to in Paragraphs (d)… we hereby mutually acknowledge and agree as follows: * * *
C.3.(b) [Pursuant] to the provisions of the refund letter referred to in Paragraph (d) above, the sum of TWENTY-SEVEN THOUSAND SEVEN HUNDRED SEVENTY-SEVEN and 78/100 DOLLARS ($ 27,777.78) will be recouped by us out of the said fee of TWO HUNDRED THOUSAND DOLLARS ($ 200,000.00) payable for each such screen-play (i.e., the total sum of FIFTY-FIVE THOUSAND FIVE HUNDRED FIFTY-FIVE and 56/100 DOLLARS ($ 55,555.56) will be recouped by us from the total fees paid for both said screenplays) and in such event your indebtedness to us, as referred to and provided in said refund letter, *522 shall be reduced accordingly. * * * In 1967, petitioner made "payments" to MGM aggregating $ 27,777.78. As in the prior year, such "payments" were made by reducing the amount MGM owed petitioner under the March 11, 1966 agreement for Trumbo's services. Consistent with its treatment of the $ 133,333.33 as a liability, petitioner reported in its income tax returns for 1966, 1967 and 1968 the $ 27,777.78 that was earned by petitioner but refunded to MGM. 3. Facts Relating to Profit Sharing Plan Contribution
Petitioner established a profit sharing plan during the fiscal year ending October 31, 1965, and the plan became effective in the same year. Appropriate steps were taken for approval of the plan, and the Internal Revenue Service approved the plan on September 30, 1966. The plan instrument provided: ARTICLE I PURPOSE OF PLAN
The purpose of the Plan is to provide a regular method whereby the Company will make contributions to a Trust which will be held for and devoted to the exclusive benefit of its employees and used to provide benefits in the event of retirement, disability, death and other specified terminations of employment. ARTICLE II EFFECTIVE *523 DATE
The effective date of the Plan shall be November 1, 1964. ARTICLE III DEFINITIONS
* * *
3.16 "COMPENSATION" shall mean all compensation for personal services, whether designated by the Company as salary, wages, commissions, and written contractual bonuses, but excluding the following: overtime, gifts and all Company contributions to the Profit Sharing Plan or any other employee benefit plan the Company now contributes to or may contribute to in the future. * * *
3.23 "ANNUAL NET PROFIT" shall mean the amount of net profit before Federal Income Taxes, earned by the Company for the particular taxable year, as calculated (in accordance with standard and accepted accounting practices) by the Company's chief auditing or fiscal officer (with the approval of the independent auditor, or auditors, engaged by the Company) by deducting from the Company's gross earnings for such year, excluding from said gross earnings all capital gains and non-recurring profits, all costs, expenses and charges incurred by the Company, including contributions to other employee benefit plans, but without deduction of the Company contributions to the Profit Sharing Plan hereunder. *524 * * *
ARTICLE V CONTRIBUTIONS
5.1 Contributions by the Company. For each taxable year the Company agrees to pay to the Trust from its net profits and earned surplus, such amounts as may be determined by the Board and communicated to the Participants prior to the close of the taxable year, provided, however, that the maximum amount the Company shall contribute to the Trust shall not exceed the maximum amount allowable to the Company as a deduction for Federal Income Tax purposes. 5.2 The annual contribution to the Plan, computed as aforementioned by the Company prior to its payment of the same to the Trust, shall be attested to by the Company's accountant to have been computed in accordance with this Plan, and shall be final and conclusive except for corrections recommended by said accountant. Neither the Trustee, any Participant, any Inactive Participant, nor any other person except the Company's accountant, shall have any right or be under any duty to inquire in the amount of, or the method or factors involved in computing the Company's contribution to the Plan for any taxable year. * * *
On April 8, 1966, petitioner made a contribution of $ 21,969.58 to *525 the profit sharing plan. The contribution was based on 15% of the total compensation paid by petitioner in 1965 and was allocated to each participant's account in the ratio that the annual compensation of each participant bore to the total annual compensation of all participants. Such payment was timely under section 404(a)(6) since the petitioner, an accrual basis taxpayer, had properly secured an extension to file its 1965 return to April 15, 1966. On its 1965 income tax return petitioner reported an operating loss before profit sharing and retirement plan contributions of $ 190,045.54. Petitioner reported on Schedule L of the same return a deficit of $ 453,976.64. 4. Facts Relating to Claimed
Worthless Film Rights and Stories
On May 21, 1965, petitioner and Howard J. Beck jointly purchased the rights to distribute a Japanese film, Onibaba, for $ 15,000 each. Shortly thereafter, petitioner expended $ 325 to have the movie translated. In August 1966, petitioner expended an additional $ 3,000 in its efforts to distribute the movie. Nevertheless, by October 31, 1966, petitioner had been unable to distribute the movie. On April 15, 1966, petitioner purchased *526 for $ 625 a story outline, entitled Waldorf, written by Anthony Leigh. It attempted to develop the story and sell it to the major studios, but by October 31, 1966, had been unsuccessful in that endeavor. In May 1966, petitioner purchased scripts entitled The Hole and The Legionnaire by Leo Gordon for $ 2,000. In June 1966 and August 1966, petitioner paid Chris Trumbo $ 750 and $ 1,250, respectively, for rewriting the script, The Legionnaire. Initially, petitioner wanted to produce independently both scripts as movies, but by October 31, 1966, had been unsuccessful in obtaining the necessary financing for production. Believing that the two scripts, one story outline and film distribution rights were worthless as of October 31, 1966, petitioner deducted $ 23,100 on its income tax return for the year ending October 31, 1966. 5. Facts Relating to Pension Plan Contribution
Petitioner established a pension plan for its employees in the fiscal year 1965. For the fiscal year ending October 31, 1967, petitioner determined that a contribution in the amount of $ 43,212.50 was to be made to the pension trust. On April 15, 1968, petitioner delivered a check in *527 that amount to the trustee of the plan. The delivery of the check was timely for purposes of section 404(a)(6) since petitioner had been granted an extension to file its return for the year ending October 31, 1967 until April 15, 1968.
The check was deposited in the trust's account. Insufficient funds, however, were available in petitioner's checking account to cover the check. On April 18, 1968, the check was returned to petitioner. Petitioner did not subsequently make good on the check. Petitioner deducted $ 43,212.50 on its 1967 tax return. Petitioner did not file an amended return for 1967 when payment was not subsequently made on the check but included in income the amount of $ 43,212.50 in its 1968 return. 6. Facts Relating to Section 6651(a) Addition to Tax
Respondent determined that petitioner is liable for an addition to tax under section 6651(a) for the fiscal year 1962 in the amount of $ 6,238.54 because the return was filed late. The return for that year was initially due on January 15, 1963. Because of petitioner's inability to have its books and records ready for its accountant prior to the initial return date, its accountant applied for an automatic *528 extension of 90 days, which was granted thereby extending the return due date to April 15, 1963. By April 15, 1963, petitioner had still been unable to gather its records for the accountant. Petitioner claims that its accountant applied for a second extension in early April 1963 to extend the return due date to July 15, 1963. No receipt of such an extension request has been found in the records of the Internal Revenue Service. In addition, no notice granting the second extension was ever received by petitioner or its accountant. Petitioner filed its 1962 return on July 16, 1963. In the return as as filed, the petitioner reported no taxable income as a result of a net operating loss carryforward from 1961. OPINION Issue 1. Deferred Compensation Accrued for Trumbo
Section 404 regulates the deductibility of contributions by an employer to an employee's trust or annuity plan and compensation under a deferred payment plan.Section 404 provides, interalia, that: (a) GENERAL RULE.--If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a *529 plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year: (1) PENSION TRUSTS.--In the taxable year when paid, if the contributions are paid into a pension trust, and if such taxable year ends within or with a taxable year of the trust for which the trust is exempt under section 501(a), in an amount determined as follows: * * * (2) EMPLOYEES' ANNUITIES.--In the taxable year when paid * * * (3) STOCK BONUS AND PROFIT-SHARING TRUSTS.-- (A) LIMITS ON DEDUCTIBLE CONTRIBUTIONS.--In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a), in an amount not in excess of * * * (5) OTHER PLANS.--In the taxable year when paid, if the plan *530 is not one included in paragraph (1), (2), or (3), if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid. [5]
Subsection (b) of section 404 provides: (b) METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN.--If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or similar plan deferring the receipt of compensation, subsection (a) shall apply as if there were such a plan. Petitioner contends that its deferral of compensation pursuant to contractual promise is not subject to the provisions of section 404.First, petitioner argues that section 404 does not apply in those situations in which a plan, or method having the effect of a plan, of deferred compensation is not similar to a pension, profit-sharing, *531 or stock bonus plan. Petitioner contends that the usual rules with respect to accrual basis taxpayers should apply, which would permit a deduction in the year the deferred compensation is accrued, subject only to the limitations imposed by section 162. See United Control Corp. v. Commissioner,38 T.C. 957 (1962). Alternatively, petitioner asserts that if section 404 is generally applicable to this type of accrued deferred compensation, section 404 is not applicable here since such accruals were made on behalf of an independent contractor and not an employee.In this regard petitioner maintains that the factual circumstances surrounding its relationship with Dalton Trumbo clearly demonstrate that Trumbo was not an employee. Respondent, on the other hand, contends that subsections 404(a)(5) and/or 404(b) are applicable in this case. Respondent also disagrees with petitioner's classification of Trumbo as an independent contractor. Rather, respondent believes that petitioner, among other factors, exercised sufficient control over Trumbo to justify our finding that he was an employee of petitioner.
We agree with respondent that petitioner's contractual arrangement *532 with Trumbo providing for the deferral of compensation is the equivalent of a method of compensation having the effect of a plan which is subject to the deductibility provisions of section 404(a)(5). Thus, assuming that the deferred compensation is accrued on behalf of an employee, it is not deductible until actually paid. Section 404(a)(5). In Latrobe Steel Co. v. Commissioner,62 T.C. 456 (1974), a court reviewed opinion, it was held that the applicability of section 404 to a plan or to a method of deferred compensation having the effect of a plan is dependent upon its similarity to either a stock bonus, pension, profit sharing, or annuity plan. Such an interpretation, we concluded, was based upon the legislative history surrounding the predecessor provision of section 404, originally enacted in the Revenue Act of 1942 as an amendment to section 23(p) of the Internal Revenue Code of 1939. We specifically examined the statutory language of section 404's predecessor during its consideration before Congress in 1942 and in its final form.We determined that, read as a whole, section 404's predecessor required a "similarity" test for both plans *533 and methods of deferred compensation. Since section 404 was enacted in 1954 unchanged from its predecessor, we concluded that section 404 also required the "similarity" test, and in Latrobe,supra at 465-67, we held that an extended vacation pay plan, while resulting in a deferral of compensation, was not: similar to a stock bonus, pension, profit-sharing, or annuity plan. The plan is unlike either a pension or annuity plan since it is not designed to provide benefits to employees upon retirement. Furthermore, the plan is unlike a profit-sharing or stock bonus plan since it is not designed to grant employees a share of the employer's profits and thereby create an incentive to contribute to the success of the employer. The compensation received by an individual while on vacation is measured neither by reference to retirement needs nor employer profits. * * *
We believe, however, that our conclusion finds support in New York Post Corp.,40 T.C. 882 (1963), in which we held that section 404 applied to payments made in accordance with a union contract to employees upon voluntary termination of employment after becoming 65 years of age or *534 completing 25 years of service. We stated that benefits in the nature of retirement or death benefits are the kind of thing that the statute is concerned with. We concluded that the payments there in issue, being in nature of retirement benefitis, were the type of deferred compensation that Congress had in mind when it provided that such compensation would not be deductible under section 162 but rather would be deductible under section 404. Thus, we implicitly recognized that Congress did not intend that all types of plans that resulted in deferring compensation be subject to the rules provided in section 404. In support of his position, respondent cites New York Seven-Up Bottling Co.,50 T.C. 391 (1968), in which we held that section 404(a) prohibited an employer from deducting unpaid severance pay liability incurred pursuant to a union contract. In New York Seven-Up the employer and the union entered into an agreement providing that, after 5 years of continuous service, any employee whose employment was terminated would be entitled to 1 week of pay for each year of service.This agreement was negotiated because some of the tasks performed by the employees *535 were physically strenuous, thereby causing a high turnover rate. The facts in New York Seven-Up are distinguishable from those in the present case since the severance pay plan resulted in the payment of benefits when an employee terminated his employment. Thus, the plan in New York Seven-Up was similar to a pension plan in that the right to receive benefits vested after a certain term of employment, the extent of benefits was related to years of service, and the receipt of benefits by the employee would not begin until after termination of his employment. Applying the restrictive interpretation given section 404 in Latrobe Steel Co., we think that the unfunded deferral of compensation in this case is essentially similar to a pension plan. A pension plan, we note, is generally defined as a plan "established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees over a period of years…. after retirement. Retirement benefits generally are measured by, and based on, such factors as years of service and compensation received by the employees." Sec. 1.401-1(b)(1)(i), Income Tax Regs. A more *536 encompassing definition is provided in the Employee Retirement Income Security Act of 1974. Section 3(2) of that Act provides: The terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program-- (A) provides retirement income to employees, or (B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.
Here the benefits accrued to Trumbo on the basis of each year of service, the final amount of benefit payable was dependent on the number of years that Trumbo performed services and the receipt of benefits would not begin until after termination of Trumbo's employment. In light of these factors, the unfunded agreement is equivalent to a method having the effect of a deferred compensation *537 plan similar to a pension plan, and accordingly is subject to the section 404 limitations on deductibility. Assuming that Trumbo was an employee, the accrued deferred compensation amounts for 1960 through 1965 would not be deductible until actually paid. We note that in the Revenue Act of 1978 Congress has apparently overruled, for tax years beginning after December 31, 1978, the restrictive interpretation given section 404 in Latrobe Steel Co. v. Commissioner,supra.
Subsection (b) of 404 now reads: If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan or otherplan deferring the receipt of compensation, subsection (a) shall apply as if there were such a plan. [Revenue Act of 1978, Sec. 133(b)]. In the conference report for the Revenue Act of 1978 the committee indicated that the amendment to section 404(b) clarifies current law by providing that a method of compensation "having the effect of a plan deferring the receipt of compensation does not have to be similar to a stock bonus, pension, profit sharing, or annuity plan to be subject to the deferred *538 compensation deduction-timing rules." H.Rept. No. 95-1800, 95th Cong., 2d Sess., 206 (1978). To determine whether an individual is an employee for purposes of section 404, we must look to common law concepts. Burnetta v. Commissioner,68 T.C. 387, 397 (1977); Packard v. Commissioner,63 T.C. 621, 629 (1975); Simpson v. Commissioner,64 T.C. 974, 984 (1975); Ellison v. Commissioner,55 T.C. 142, 152 (1970); James v. Commissioner,25 T.C. 1296, 1300 (1956); Hand v. Commissioner,16 T.C. 1410, 1414 (1951). Section 31.3121(d)-1(c)(2), Employment Tax Regs., provides one statement of the common law definition of employer-employee relationship: (2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done.In this connection, *539 it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. * * * Another explanation is found in section 220 of 1 Restatement of Agency 2d: A servant [employee] is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control. The existence of a common law employer-employee relationship is not determined simply by an arbitrary application of one of the general definitions. Whether two parties stand in an employer-employee relationship is a factual question. Simpson v. Commissioner,supra at 984; Ellison v. Commissioner,supra at 152; James v. Commissioner,supra at 1300; and Hand v. Commissioner,supra at 1414. Among the relevant factors to which the courts have looked in determining the substance of the employment relationship are the following: *540 (1) the degree of control exercised by the principal over the details of the work, (2) which party invests in the facilities used in the work, (3) the opportunity of the individual for profit or loss, (4) whether the principal has the right to discharge the individual, (5) whether the work is part of the principal's regular business, (6) the permanency of the relationship, and (7) the relationship the parties believe they are creating. Simpson v. Commissioner,supra at 984-85; Sec. 31.3121(d)-1(c)(2), Employment Tax Regs.; United States v. Silk,331 U.S. 704, 716 (1947); Ellison v. Commissioner,supra at 153; Illinois Tri-Seal Products, Inc. v. United States,173 Ct. Cl. 499, 353 F.2d 216, 228 (1965); 1 Restatement of Agency 2d, supra.
In assessing all of the pertinent factors, no one factor is controlling; rather, the result should be governed by the entire situation and the special facts and circumstances of each case. Sec. 31.3121(d)-1(c)(3), Employment Tax Regs.; United States v. Silk,supra;CapeShore Fish Co. v. United States,165 Ct. Cl. 630, 636-37, 330 F.2d 961, 985 (1964). *541 Upon consideration of the facts and circumstances in this case, we agree with respondent that Dalton Trumbo was an employee of petitioner. Petitioner had an exercised the right to require Trumbo to work on three screenplays a year for the life of the contract. In addition, specific stories for adaptation by Trumbo were enumerated in the agreement. While it is true that mutual agreement of the parties, pursuant to contract provision, was theoretically necessary in determining what other stories were to be adapted into screenplays, we think such contract provision must be read in conjunction with the provisions authorizing petitioner to "loanout" Trumbo to other production companies, and petitioner's exclusive work clause with Trumbo. Much emphasis has been placed by petitioner on Trumbo's complete freedom in determining where, when and under what circumstances he would perform his writing services. Although he did no writing in petitioner's office, we do not think that this freedom necessarily mandates a conclusion that he was an independent contractor. Lack of control over detail, manner of work, and means in which a result is reached is usually a good barometer of independent *542 contractor status, but the circumstances underlying the nature and obligations of Trumbo's services mitigate against such a result here. Dalton Trumbo was an experienced writer who, petitioner's president testified, preferred to write in a bathtub. We are fully aware that creative genius cannot be turned on at 9 a.m. and off at 5 p.m. To reach the conclusion that Trumbo is an independent contractor because he does not come to the office of petitioner or because he was given substantial independence in his manner and style of writing would be to ignore Trumbo's proven literary abilities. Other factors have influenced us in our determination that Trumbo was an employee. First, Trumbo during his exclusive service contract with petitioner did not hold himself out to the general public for other employment. Second, petitioner reimbursed Trumbo for all expenses incurred in his writing. Third, petitioner provided transportation for Trumbo whenever Trumbo believed it necessary for the successful completion of his writing. Fourth, petitioner provided a secretary to Trumbo for the typing of manuscripts. Fifth, the relationship between petitioner and Trumbo was of a permanent nature. *543 Finally, petitioner made Trumbo a participant of its employee profit sharing and pension plans. On the statements filed in support of the pension and profit sharing deductions claimed, Trumbo was listed as an employee. The pension plan and profit sharing plan were established on November 1, 1964, the first day of petitioner's 1965 fiscal year. We note that the service requirement under the profit sharing plan required two years of service as an employee as of November 1, 1964 in order to be eligible under the plan. We do not believe that the September 1965 amendment of petitioner's 1963 extension agreement with Trumbo in any way changed the requirement of two years of service as an employee for coverage under the plan. Thus, petitioner, by its own actions, seeks to affix the label "employee" on Trumbo for the purpose of participation in its qualified plans. We fail to see, however, as petitioner urges, that the 1965 amendment made Trumbo an employee only from January 1, 1965 forward. No changes in the relationship between petitioner and Trumbo were effected by the amendment other than a change in the manner and amount of future deferred compensation payments. If Trumbo *544 could be an "employee" from 1965 forward by the stroke of a pen, we do not see why much credence should be given, in this instance, to the original contract provision labeling Trumbo an independent contractor. Petitioner's relies on various revenue rulings, Rev. Rul. 69-224, 1969-1 C.B. 256; Rev. Rul. 68-644, 1968-2 C.B. 468; Rev. Rul. 65-312, 1965-2 C.B. 394, which are distinguishable on their facts. For example, in Rev Rul. 65-312, 1965-2 C.B. 394, taxpayer was an individual who wrote a column on gardening for a local newspaper. He was paid only for material accepted, as is not the case here, and held himself out for other writing positions. Thus, we conclude that Trumbo was an employee [6] of petitioner for purposes of section 404. In accordance with our opinion that the accrued but unfunded deferred compensation agreement is subject to the deductibility limitations of section 404(a)(5), petitioner is not entitled to deduct the deferred compensation in the year of accrual, but only in the year actually paid. Since it is not necessary for resolution of this case, we make no determination as to when, if ever, such compensation *545 was actually paid. It is clear, however, that such deferred compensation was not paid during the period 1960-1967. Issue 2. Amounts Received from MGM
*546 Petitioner and MGM entered into an agreement on June 8, 1965 in which petitioner loaned the services of Dalton Trumbo to MGM to write a screenplay based upon the novel Wanderers Eastward, Wanderers West. MGM made payments totaling $ 133,333.32 on the contract and expected delivery of the script in September 1965. When petitioner failed to deliver the script, MGM demanded that petitioner refund the money. Petitioner informed MGM that it did not have sufficient cash on hand to make an immediate cash refund. Thereafter, and before October 31, 1965, petitioner and MGM orally agreed to terminate the original contract and to loan Trumbo for future writing services at a specified contract price less the $ 133,333.32, which was to be ratably "refunded" over the period of years that Trumbo would write for MGM. Of the $ 133,333.32, only $ 83,333.32 was to be refunded; if petitioner properly performed the new agreement, the remaining $ 50,000 was to be "forgiven". This agreement was reduced to writing on March 11, 1966. Petitioner contends that the $ 133,333.32 received in 1965 was not properly includible as income in the 1965 fiscal year since the original contract was terminated *547 prior to the end of its fiscal year. Rather, petitioner maintains, the money advanced by MGM was converted into a bona fide loan which petitioner had a binding obligation to repay at year end. Moreover, petitioner asserts, its position is buttressed by its consistent treatment of the loan as a liability on its books and records, its "repayments" in 1966, 1967 and 1968 and its inclusion in income in later years of the full contract price for subsequent services to MGM without diminution for the refunds. Respondent, however, would have us view the $ 133,333.32 as an advance payment for future services. Such advance payments, respondent maintains, would be includible in income in the year of receipt. Respondent contends that given petitioner's inability to repay, the subsequent agreements must be considered together with petitioner's failure to perform under the first agreement. In this way, respondent maintains, the March 11, 1966 written document formalizing the earlier oral agreement merely represented a substitution of future services for services not performed in 1965. Respondent asserts that the "refund" of $ 133,333.32 is nothing more than a credit or an advance against future *548 service contracts. Petitioner's actions consistent with its loan theory, respondent believes, represent nothing more than a "meritless smokescreen" to improperly defer the recognition of income includible in 1965. We agree with respondent that the money received by petitioner constituted an advance payment for future services. We think that the contracts must be viewed as an integrated whole, and, in such a light, petitioner and MGM merely substituted future services for services not performed in 1965. Such "repayment" of the $ 133,333.32, as it were, was by the rendition of services in future years at a price less the pro-rated $ 133,333.32. Petitioner relies on Russel v. Commissioner, 35 B.T.A. 602 (1937) and Clark v. Commissioner, 11 T.C. 672 (1948) appeal dismissed, (6th Cir. June 13, 1949), in support of its view that the $ 133,333.32 was a loan and thus not properly includible in income in 1965. While these cases would support petitioner in its statement of the law if we find that the money received constituted a loan, we do not so hold. In Russel v. Commissioner, supra, the taxpayer repaid the money originally *549 received as compensation in the same year. In Clark v. Commissioner, supra, we found as a fact that taxpayer had given a promissory note to his employer for an overpayment of compensation and that taxpayer and his employer regarded the note as a binding obligation and expected it to be paid in full. Clark v. Commissioner, supra at 675. The underlying circumstances here do not suggest that a true loan was established. To the extent that the advance could be considered a "loan", its payment was to be by future services performed. "Repayment" was by performance of services. Advance payments for future services, under the decisions in Schlude v. Commissioner, 372 U.S. 128 (1963), American Automobile Ass'n v. United States, 367 U.S. 687 (1961), Automobile Club of Michigan v. Commissioner, 353 U.S. 180 (1957), rehearing denied, 353 U.S. 989 (1957), are includible in income when received. In those cases accrual basis taxpayers sought to defer the taxation of advance income which they had received on the ground that part of such income was advance payment for services to be rendered *550 in subsequent years. The Supreme Court considered the argument that, under generally accepted accounting principles, such income is prorated over the period in which it is earned by services performed. Nonetheless, the Court held that the income was taxable in the year received. The Court's opinion in the three decisions was influenced by prior legislative activities concerning tax treatment of prepaid income. Congress had once provided for the deferral of prepaid income but retroactively repealed such provisions one year later. [7] In view of this legislation, the Court took the position that any relief from taxation of prepaid income must be provided for by Congress. [8]
In numerous decisions since that time we have held that if a taxpayer receives income which is not subject to any restriction, such income is taxable when received, unless Congress has provided specifically for its deferment. E.g., S. Garber, Inc. v. Commissioner, 51 T.C. 733 (1969); *551 Artnell Co. v. Commissioner, 48 T.C. 411 (1967), revd. and remanded, 400 F.2d 981 (7th Cir. 1968); Bell Electric Co. v. Commissioner, 45 T.C. 158 (1965); Farrara v. Commissioner, 44 T.C. 189 (1965); Huebner v. Commissioner, T.C. Memo. 1966-73. See also United States v. Lewis, 340 U.S. 590 (1951); Brown v. Helvering, 291 U.S. 193 (1934); North American Oil Consol. v. Burnet, 286 U.S. 417 (1932). Petitioner cites Beacon Publishing Co. v. United States, 218 F.2d 697 (10th Cir. 1955), revg. 21 T.C. 610 (1954) and Schuessler v. Commissioner, 230 F.2d 722 (5th Cir. 1956), revg. 24 T.C. 247 (1955), in support of its view that an accrual basis taxpayer should not include in income advance payments for future services until the right to that payment has been earned. We note that these cases were decided prior to the Court's decisions in Schlude v. Commissioner, supra; American Automobile Ass'n v. United States, supra and Automobile Club of Michigan v. Commissioner, supra, *552 and are apparently overruled. Bell Electric Co. v. Commissioner, supra; Popular Library Inc. v. Commissioner, 39 T.C. 1092 (1963). Accordingly, the entire $ 133,333.32 is includible in income in the 1965 taxable year. Concurrently, we must reduce petitioner's reported income by $ 27,777.77 in 1966 and 1967 since the income for these years in issue has been overstated. Issue 3. Profit-Sharing Contribution
One of the significant characteristics of a profitsharing plan is that contributions made by the employer are necessarily dependent upon profits. Latrobe Steel Co. v. Commissioner, 62 T.C. 456 (1974); Liberty Nat'l Life Ins. Co. v. United States, 77-1 U.S.T.C. P9107 (Ala. 1976); Mississippi River Fuel Corp. v. Koehler, 266 F.2d 190, 195 (8th Cir. 1959). The regulations under section 401 provide: A profit-sharing plan is a plan established and maintained by an employer to provide for the participation in his profits by his employees or their beneficiaries. The plan must provide a definite predetermined formula for allocating the contributions made to the plan among the participants *553 and for distributing the funds accumulated under the plan after a fixed number of years, the attainment of a stated age, or upon the prior occurrence of some event such as layoff, illness, disability, retirement, death or severance of employment. [Section 1.401-1(b)(1)(ii), Income Tax Regs.] While petitioner and respondent are not in disagreement that petitioner has validly established a profitsharing plan within the meaning of section 401 and the regulations thereunder, the respondent contends that a contribution that is not made out of profits, either current or accumulated, is not deductible under section 404. Petitioner, on the other hand, asserts that a contribution made within the guidelines provided under section 404(a)(3)(A) [9] is deductible in the year contributed [10] without regard to the existence of profits. We agree with respondent. *554 We think that the very term "profit-sharing" necessitates that deductible contributions to a profit-sharing plan be made from current or accumulated profits. [11] While it is true that section 404(a)(3)(A) does not specifically mandate that a deductible contribution be from profits, the definition of a profit-sharing plan, both in the regulations and judicial opinions, leaves little doubt that "profits" are a necessary element in section 404(a)(3)(A). The limitations under section 404(a)(3)(A), we think, solely provide for the maximum deductible contribution an employer can make in a year in which he has the necessary profits and in which the company authorizes such a contribution. Finally, section 404(a)(3)(B), which regulates the availability and deductibility of contributions made by one member of an affiliated group to another group member's profit-sharing plan, implicitly supports our view. Section 404(a)(3)(B) provides that "if any member of such affiliated group is prevented from making a contribution which it would otherwise have made under the plan, by reason of having no current or accumulated earnings or profits or because such earnings or profits are less than the *555 contributions which it would otherwise have made, then so much of the contribution which such member was so prevented from making may be made…" from the earnings and profits of the other members of the affiliated group. If, upon the subsequent determination under Rule 155, Tax Court Rules of Practice and Procedure, either current or accumulated profits are found to be available in 1965 as a result of our opinion, petitioner will be entitled to a deduction under section 404 to the extent of such profits. Issue 4. Claimed Worthless Film Rights and Stories
Petitioner purchased the rights to distribute a foreign movie, Onibaba, in 1965. Petitioner also purchased a story outline entitled The Waldorf on April 15, 1966, for $ 625. Petitioner purchased two scripts, The Hole and The Legionnaire in May 1966 for $ 2,000 and expended a total of $ 2,000 in June and August 1966 for a rewrite of The Legionnaire. On its return for the 1966 *556 fiscal year petitioner deducted $ 23,100 for the above stories and film, claiming that such properties were worthless as of October 31, 1966. Petitioner contends that its effort to obtain financing to produce movies from the purchased scripts and outline were fruitless and that it was unsuccessful in its efforts to distribute the film. As a result, petitioner maintains that it properly deducted the costs of these alleged worthless properties in 1966. Respondent, on the other hand, contends that petitioner has not demonstrated that these properties were in fact worthless. Respondent argues that the record contains no documentation that petitioner attempted to obtain financing for the two scripts and outline or that the distribution rights to the film lapsed during 1966.
Section 165 provides that: (a) GENERAL RULE.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b). AMOUNT OF DEDUCTION.--For purposes of subsection (a), the basis for determining the amount of deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition *557 of property. Petitioner must prove that the loss occurred during the taxable year in which the deduction is claimed. Levy v. Commissioner, 30 T.C. 1315 (1958); Crawford v. Commissioner, T.C. Memo. 1961-148; Rule 142, Tax Court Rules of Practice and Procedure. Petitioner has not met its burden of proof. With respect to the film Onibaba, petitioner was unable to specifically state when the rights of distribution lapsed or would lapse. Although petitioner's president, Mr. Frenke, testified that documentation of the lapse date and unsuccessful distribution efforts could be adduced, no such proof has been presented. With respect to the scripts, The Hole and Legionnaire, petitioner has offered no documents or witnesses to support his statements that substantial efforts at financial backing were sought and rejected. Moreover, we find the short period of time between the purchase of these scripts and October 31, 1966 to permit an inference that worthlessness was improbable by year end. No proof of worthlessness for the outline The Waldorf has been offered except for Mr. Frenke's opinion that the outline had no commercial value. *558 Petitioner argues that in the absence of expert testimony by the respondent we are bound to accept the testimony of petitioner's president and self-proclaimed expert, Mr. Frenke, that the properties were worthless.Petitioner cites Mertens: The weight to be given to opinion evidence depends on its origin, and the thoroughness with which it is supported by experience and facts…. Expert testimony as to valuation of property cannot be disregarded by the Tax Court where there is no other evidence and that tribunal has no knowledge of its own in regard to the valuation of the property. [10 Mertens, Law of Federal Income Taxation, sec. 59.03]. Nevertheless, petitioner acknowledges that this Court, as the trier of fact, is not bound to believe or to accept the opinion evidence of interested witnesses. Moreover, the extent to which such evidence may be affected by self-interest is also within our discretion. Mr. Frenke testified that "we then submitted the film for distribution, or for sale, to all the major studies and small distribution companies, with equally unsuuccessful results." Yet petitioner could not, or would not, support Mr. Frenke's statements by producing additional *559 proof that corroborated such efforts. Thus, we are left with bare assertions by an interested witness that efforts were made and that such unsuccessful efforts immediately mandated loss treatment.In the absence of more substantial proof than the statement of petitioner's president, we think petitioner has not proved the worthlessness of the properties in 1966.petitioner also argues, somewhat cryptically, that the expense in purchasing the scripts, outline and film and the rewrite expense should be deductible under section 162. A careful reading of petitioner's briefs indicates, however, that petitioner is essentially arguing the provision regarding loss under section 165, and not section 162. [12]
Issue 5. Pension Plan Contribution
Section 404 provides that if contributions are made by an employer to a qualified pension trust, they are deductible in the taxable year paid. The requirement of actualpayment applies to both cash basis *560 and accrual basis taxpayers.Accrual basis taxpayers, however, "shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extentions thereof)." Section 404(a) (6). [13]
The petitioner timely delivered a check, representing a contribution for the 1967 taxable year on April 15, 1968, to the trustee of the plan. The check was subsequently dishonored because of insufficient funds in petitioner's checking account. Petitioner deducted the contribution expense on its 1967 tax return. Petitioner contends that timely delivery of the check on April 15, 1968 requires that we consider the contribution as paid on that date without regard to the subsequent dishonor. Moreover, petitioner maintains that since it restored the contribution expense to income in the subsequent taxable year, the question of the validity of the deduction in 1967 becomes irrelevant. Respondent, on the other hand, contends that payment was not timely made under section 404 and that the deduction in the *561 1967 fiscal year was improper. Subsequent treatment of the contribution amount as income, he asserts, has no bearing on the propriety of the deduction for 1967. We agree with respondent.
Delivery of a check is considered to be a conditional payment which becomes an absolute payment as of the date of delivery when the check is paid. See Cain-White Co.,Inc. v. Commissioner,T.C. Memo. 1978-438; Estate of Spiegel v. Commissioner,12 T.C. 524 (1949); Broussard v. Commissioner,16 T.C. 23 (1951); Estate of Hubbell v. Commissioner,10 T.C. 1207 (1948); Estate of Bradley v. Commissioner,19 B.T.A. 49 (1930), aff'd 56 F.2d 728 (6th Cir. 1932). Thus, petitioner's deduction was dependent upon proper payment of the check. Petitioner's request that we look only to the date of delivery as determinative of payment without regard to whether actual payment is made would be to ignore the clear statutory language in section 404(a)(6) that actualpayment be made. See Don E. Williams Co. v. Commissioner,429 U.S. 569 (1977), affg. 527 F.2d 649 (7th Cir. 1975), *562 affg. 62 T.C. 166 (1974). Petitioner's contention that we should ignore an incorrect deduction in our redetermination of the deficiency for the fiscal year 1967 because of its inclusion in income in 1968 of the amount deducted in 1967 is without merit. In our redetermination proper regard must be given to statutory provisions as to when deductions and items of income are to be reported. Petitioner, upon the check's dishonor, could properly have filed an amended return for the 1967 fiscal year. Issue 6. Section 6651(a) Addition to Tax
Section 6651(a) imposes an addition to tax for a taxpayer's failure to file a required return on or before the specified filing date, including extensions. Such addition to tax may be avoided, however, if the taxpayer can show that the failure to file the return was due to reasonable cause and not due to willful neglect. Petitioner contends that the filing of its 1962 tax return was timely [14] since its accountant had procured an extension to file until July 15, 1963. As a result, petitioner maintains that such reliance on the existence of an extension would provide reasonable cause if the extension request was never received *563 or processed by the Internal Revenue Service, and, if received, would obviate the application of section 6651. Petitioner also contends that its reliance on its accountant provides reasonable cause for the late filing. Respondent, on the other hand, claims that he never received any request to extend the due date for filing beyond April 15, 1963, the date for filing the return under the automatic extension initially granted petitioner. Respondent asserts that, if a second extension request was mailed to them, such extension was of the type that required specific approval by the Internal Revenue Service. Thus, respondent contends, in the absence of a communication by the Internal Revenue Service to petitioner granting approval, it was unreasonable for petitioner or his accountant to rely on their unfounded belief that an extension was granted. Respondent also maintains that the petitioner filed its return late because of its dilatory actions in providing its accountant with the necessary books and records. We are not convinced that petitioner's accountant actually prepared and mailed a second request on April 8, 1963 for *564 an extension to July 15, 1963.In testimony, the accountant could not specifically recall whether he had in fact sent such a request. Moreover, he was unable to provide even a copy of the request letter that was necessary to obtain a second extension. The inference from the accountant's testimony was that an automatic extension form was sent to the Internal Revenue Service to obtain a second extension. This, however, would not have been proper under the statutes and regulations authorizing the granting of extensions.Although a maximum six months extension after the original return date is permitted corporate taxpayers, section 6081(b) permits a corporation an automatic extension only for a three month period from the original return date. Extension for greater than the three month period must be requested under section 6081(a).
Assuming argendo that petitioner's accountant prepared a second extension request under sections 6081(a) or (b), it was still necessary that either extension be granted. The failure of petitioner or his accountant to investigate why a notification granting the extension had not been received eliminates any reasonable reliance they have claimed in relation *565 to the initial mailing of such request. Petitioner also attempts to show reasonable cause by its reliance on the accountant to prepare all necessary returns and to obtain extensions. Such an argument has been rejected by this Court. E.g. Elliott v. Commissioner,40 T.C. 304 (1963); Wallace v. Commissioner,T.C. Memo. 1975-133. See also Custom Component Switches, Inc. v. United States,396 F.2d 514 (9th Cir. 1968); Logan Lumber Co. v. Commissioner,365 F.2d 846 (5th Cir. 1966). Petitioner is charged with the primary responsibility to see that its returns are timely filed. It cannot avoid this responsibility by shifting it to its accountant. An accountant is merely the agent of the taxpayer. Wallace v. Commissioner,supra.It is a common agency principle that the principal (petitioner)is responsible for the actions of his agent (accountant). Logan Lumber Co. v. United States,supra. Moreover, petitioner's accountant testified that it was necessary for one of petitioner's officers to sign the extensions that the accountant prepared. It was the accountant's usual custom to mail *566 the prepared forms to petitioner who would then submit the forms to the Internal Revenue Service. See sections 1.6081-1 and 1.6081-3, Income Tax Regs. Thus, ultimate responsibility for the filing of any extensions, in agency theory as well as fact, lay with petitioner. The test under section 6651 requires petitioner to show both reasonable cause for the delay and a lack of willful neglect. Since the petitioner has been unable to demonstrate reasonable cause, the addition to tax is properly imposed on the net amount of tax due.
To reflect the concessions of the parties and our conclusions with respect to the disputed issues, Decisions will be entered under Rule 155.
Footnotes
1. The parties in this case have identified a particular fiscal year by the year in which the October 31 closing date falls. Thus, the 1962 fiscal year is the fiscal period from November 1, 1961 to October 31, 1962.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
3. We note that both parties have acknowledged the applicability of a net operating loss carryback from the year 1965 to the years 1962, 1963, 1964, if we conclude that all or part of the net operating loss for 1965 exists. Petitioner's request that we determine that it is entitled to a refund for 1965 is beyond our jurisdiction. 1965 is only in issue to the extent that the reported net operating loss affects prior or subsequent years in issue. Nonetheless, to the extent that petitioner has other jurisdictional remedies to secure a refund, our determination that a net operating loss exists would be dispositive in such subsequent litigation. Petitioner has also raised, on brief, the applicability, if necessary, of a carryback of the 1968 net operating loss for the 1966 and 1967 fiscal years. Respondent claims that he has not had an opportunity to examine the 1968 loss. In the absence of proof, we cannot determine whether a carryback from 1968 exists for purposes of determining the 1966 and 1967 deficiencies. Thus, we leave this issue for the parties to resolve in the Rule 155↩ computation.
4. Petitioner's request that we award attorney's fees in this case is denied. As we held in Key Buick Co. v. Commissioner,68 T.C. 178↩ (1977), on appeal 5th Cir., this Court is without jurisdiction to award attorney's fees to petitioner.
*. The reported net income set forth above for years 1962, 1966, and 1967 are before the application of net operating loss deduction carryovers from prior years.↩
5. Section 404(a)(5) was amended by Sec. 321(b)(3) of the Tax Reform Act of 1969, Pub. Law 91-172, 83 Stat. 457, to make the deduction available in the taxable year in which an amount attributable to the contribution is includible in the gross income of the employee.↩
6. The necessity of determining whether an individual is an employee or independent contractor for purposes of the applicability of section 404's deduction limits has been eliminated for taxable years beginning after December 31, 1978. The Revenue Act of 1978, section 133, has amended section 404 by adding a new subsection, (d), as follows: (d) DEDUCTIBILITY OF PAYMENTS OF DEFERRED COMPENSATION, ETC., TO INDEPENDENT CONTRACTORS:-- If a plan would be described in so much of subsection (a) as precedes paragraph (1) thereof (as modified by subsection (b)) but for the fact that there is no employer-employee relationship, the contributions or compensation-- (1) shall not be deductible by the payor thereof under section 162 or 212, but (2) shall (if they would be deductible under section 162 or 212 but for paragraph (1)) be deductible under this subsection for the taxable year in which an amount attributable to the contribution or compensation is includible in the gross income of the persons participating in the plan.↩
7. Sections 452 and 462, repealed by Pub. L. 74, 84th Cong., 1st Sess., 69 Stat. 134.↩
8. Such relief can be found in sections 455 (prepaid subscription) and 456 (prepaid dues income of certain membership organizations). Both sections are inapplicable here.↩
9. Section 404(a)(3) provides: (A) LIMITS ON DEDUCTIBLE CONTRIBUTIONS.--In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a), in an amount not in excess of 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the stock bonus or profit-sharing plan.If in any taxable year there is paid into the trust, or a similar trust then in effect, amounts less than the amounts deductible under the preceding sentence, the excess, or if no amount is paid, the amounts deductible, shall be carried forward and be deductible when paid in the succeeding taxable years in order of time, but the amount so deductible under this sentence in any such succeeding taxable year shall not exceed 15 percent of the compensation otherwise paid or accrued during such succeeding taxable year to the beneficiaries under the plan. In addition, any amount paid into the trust in any taxable year in excess of the amount allowable with respect to such year under the preceding provisions of this subparagraph shall be deductible in the succeeding taxable years in order of time, but the amount so deductible under this sentence in any one such succeeding taxable year together with the amount allowable under the first sentence of this subparagraph shall not exceed 15 percent of the compensation otherwise paid or accrued during such taxable year to the beneficiaries under the plan. The term "stock bonus or profit-sharing trust", as used in this subparagraph, shall not include any trust designed to provide benefits upon retirement and covering a period of years, if under the plan the amounts to be contributed by the employer can be determined actuarially as provided in paragraph (1). If the contributions are made to 2 or more stock bonus or profit-sharing trusts, such trusts shall be considered a single trust for purposes of applying the limitations in this subparagraph. ↩
10. Petitioner's contribution, if held deductible, was timely under section 404(a)(6). As an accrual basis taxpayer, petitioner had until April 15, 1966, the date the return was due under the extension, to make the contribution. The contribution was made on April 8, 1966. Subsequent to the years in issue sec. 404(a)(6) was amended to allow cash basis taxpayers to deduct pension and profit-sharing payments made subsequent to the end of their taxable year, but prior to the due date of their return. However, this amendment is effective only for plan years commencing after December 31, 1975. See Pub. L. No. 93-406, secs. 1013(c)(2) and 1017(b), 1974-3 C.B. 92↩, 101.
11. Current or accumulated profits may be computed in either a tax or financial accounting sense to determine if the organization has "profits" available for contribution. Rev. Rul. 66-174, 1966-1 C.B. 81↩.
12. While section 162 permits as a business expense losses incurred in a trade or business, petitioner must still prove the validity of the loss, and in that regard, has not demonstrated the properties acquired as being worthless.↩
13. See footnote 10, supra.↩
14. Petitioner filed its 1962 return on July 16, 1963.↩